JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**MDL** 1 5 0 7

JAN - 2 2008

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**MDL DOCKET NO. 1507**

**IN RE PREMPRO PRODUCTS LIABILITY LITIGATION**

<u>**WYETH'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-122)
AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**</u>

The purpose of multidistrict litigation is to avoid duplicative discovery, prevent inconsistent pretrial rulings and conserve judicial resources. 28 U.S.C. § 1407; *In re Air Disaster*, 486 F. Supp. 241, 243 (Jud. Pan. Mult. Lit. 1980). Transferring this case, styled *Graciana Manalo, et al. v. Wyeth, et al.* (D. Minn. 07-4557 (JMR/SRN)) (the "Minnesota Action"), to the Arkansas MDL would serve none of those purposes and, in fact, would frustrate that goal. Therefore, Wyeth requests that Conditional Transfer Order 122 be vacated for the following reasons:

First, Plaintiffs' first-filed action against Wyeth in the Philadelphia Court of Common Pleas ("P.C.C.P.") styled *Graciana Manalo, et al. v. Wyeth Pharmaceuticals, Inc., et al.*, P.C.C.P., June Term 2004, No. 004503 (the "Pennsylvania Action"), has been pending there for more than three years as part of a court-managed Mass Tort Litigation proceeding involving more than 1,500 separate suits supervised by The Honorable Allan Tereshko. In the Pennsylvania Action, Wyeth has a Summary Judgment Motion pending based upon the

**OFFICIAL FILE COPY** IMAGED JAN 2 2008

application of Pennsylvania's two-year statute of limitations. Upon receiving notice of that Motion on November 7, 2007, Plaintiffs' counsel immediately discontinued the Pennsylvania Action without prejudice on November 8, and then simultaneously filed suit in Minnesota federal court based on the same claims. On December 7, 2007, Judge Tereshko granted Wyeth's Petition to Strike Off that Discontinuance and reinstated the Pennsylvania case so Wyeth could proceed with its Summary Judgment Motion. Second, Wyeth brought a Motion to Dismiss and/or Stay the Minnesota Action pending resolution of Wyeth's Summary Judgment Motion in the Pennsylvania Action. The Minnesota Court will hear that Motion on February 11, 2008.

Finally, Plaintiffs' tactical discontinuance of the Pennsylvania Action in the face of Wyeth's Summary Judgment Motion and then simultaneously racing to file the same claims in the Minnesota Court on the same day is classic forum shopping and an improper and vexatious use of the courts that prejudices Wyeth. Plaintiffs began their lawsuit in Pennsylvania over three years ago and should not be permitted to escape the ramifications of their choice of forum at the eleventh hour in the face of an adverse, dispositive ruling by filing a duplicative lawsuit and labeling it as a potential tag along action to be added to over four thousand other cases. Judicial economy and efficiency will not be served by transfer of this case to the MDL.

## PROCEDURAL HISTORY AND FACTUAL BACKGROUND

A.     **Background of P.C.C.P. HRT Mass Tort Litigation and Procedural History of Plaintiffs' Complaints.**

Plaintiffs' suit is one of over 1,500 similar cases filed in Pennsylvania State Court claiming that Wyeth's Hormone Replacement Therapy ("HRT" or "HT") products, used to relieve menopausal symptoms, caused the plaintiff women to develop breast cancer or other serious side effects or diseases. On July 2, 2004, these Illinois Plaintiffs filed their suit in the Philadelphia Court of Common Pleas ("P.C.C.P.") where it was consolidated into a court-

managed Mass Tort Litigation proceeding supervised by The Honorable Allan Tereshko. (Affidavit of Carrie L. Hund Ex. A, Plaintiffs' Short Form Complaint). As part of that HT Mass Tort Litigation, this case has been subject to the Pennsylvania Court's governing case management and discovery orders that address all aspects of pretrial proceedings, including expert discovery and *Frye* motions, as well as dispositive and nondispositive motions.

Mrs. Manalo claims in her Complaint that she took Prempro from 1996 until November 2000, and that her HRT use caused her breast cancer. *Id.* at ¶¶ 2-3. On July 8, 2004, just six days after filing the Pennsylvania Action, Plaintiffs filed an essentially identical action against the Wyeth Defendants in the Superior Court of New Jersey, Law Division, Atlantic County ("New Jersey Action"). (Hund Aff. Ex. B, Plaintiffs' Complaint, Docket No. ATL-L-2102-04). The New Jersey Action also claimed that Mrs. Manalo's Prempro use caused her breast cancer. *Id.* at ¶ 1. Over a year later, on August 24, 2005, pursuant to stipulation, Plaintiffs voluntarily dismissed their New Jersey Action without prejudice in order to **"pursue their claims in the Pennsylvania State Court[.]"** (Hund Aff. Ex. C, Voluntary Dismissal Without Prejudice) (emphasis added). The Philadelphia and New Jersey Actions were both filed more than two years after Mrs. Manalo was diagnosed with breast cancer. The statute of limitations in Plaintiffs' home state of Illinois as well as in Pennsylvania is two years.[1] *See* 735 Ill. Comp. Stat. 5/13-202; 42 Pa. C.S. § 5524(2).

On September 24, 2007, Judge Tereshko granted the Wyeth Defendants summary judgment in the case of *Coleman v. Wyeth, et al.*, ruling that Pennsylvania's two-year statute of limitations applied to another HT plaintiff's case. (Hund Aff. Ex. D). As part of that ruling, Judge Tereshko found that, under Pennsylvania law, an Arkansas plaintiff had two years from the date of her breast cancer diagnosis in October 2000 to file her claims. Her failure to do so

---

[1] The statute of limitations in New Jersey is also two years. N.J. Stat. Ann. § 2A:14-2a.

within the two year limitations period barred her claims against Wyeth as a matter of law. *Id.* Thereafter, Wyeth notified the Manalo Plaintiffs and their counsel that they intended to bring a Summary Judgment Motion for dismissal on statute of limitations grounds because Mrs. Manalo failed to file her complaint within two years of her November 2000 breast cancer diagnosis. (Hund Aff. Ex. E).

In response, Plaintiffs filed a precipitous *praecipe* of discontinuance without prejudice because Judge Tereshko's statute of limitations ruling in the *Coleman* case had suddenly made the P.C.C.P. an inimical forum for stale claims like those asserted in the *Manalo* Complaint. (Hund Aff. Ex. F). Plaintiffs' discontinuance came over three years after originally instituting their action in the Pennsylvania Court, and only after they were faced with a summary judgment motion on statute of limitations grounds. Wyeth immediately filed a Petition to Strike Off Plaintiffs' Discontinuance. On December 7, 2007, Judge Tereshko granted Wyeth's Petition and struck off Plaintiffs' *Praecipe* for discontinuance, thereby reinstating the action in the Pennsylvania court. (Hund Aff. Ex. G).

The *very same day* that Plaintiffs filed the discontinuance of the Pennsylvania Action, they filed a third, essentially identical complaint against Wyeth in Minnesota federal court, claiming that Mrs. Manalo's hormone replacement therapy use caused her breast cancer. (See Plaintiffs' Complaint ("Minnesota Action")). There is no substantive difference between the three separate actions filed by Plaintiffs against Wyeth in Pennsylvania, New Jersey or Minnesota. The only explanation for the attempted discontinuance of the Pennsylvania Action and the simultaneous filing of yet a third Complaint in Minnesota is that Plaintiffs are forum shopping, seeking to avoid the bar of the statute of limitations.[2] It is patently clear that, because

---

[2] While Wyeth does not believe a Minnesota court could, under these circumstances, properly apply its statute of limitations, it is worth noting that Minnesota's limitations periods are six years (with respect to negligence and other

Plaintiffs were faced with a judgment against them in Philadelphia based on the two-year statute of limitations, Plaintiffs discontinued that action so they could re-file the same case in Minnesota. Such blatant forum shopping should not be tolerated or condoned by any court. For these reasons, Wyeth filed its Motion to Dismiss and/or Stay the Minnesota Action based upon the abstention doctrine of *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-818 (1976). (Hund Aff. Ex. H). That Motion is scheduled to be heard on February 11, 2008 and, if granted, will make transfer of the Minnesota Action to the MDL moot. (*Id.*).

## ARGUMENT

I.    **PLAINTIFFS' SUIT SHOULD BE RESOLVED IN THE PENNSYLVANIA COURT WHERE IT HAS BEEN PENDING FOR MORE THAN THREE YEARS.**

Multidistrict litigations serve to ensure that all relevant discovery and other pretrial proceedings involving common cases take place in a coordinated fashion and that none of the parties are subjected to duplicative discovery or the risk of inconsistent decisions on pretrial matters. *See* 28 U.S.C. § 1407. Given that the Manalo Plaintiffs' 2004 Pennsylvania Action has been pending for more than three years, has already progressed to summary judgment, and potentially will be dismissed with prejudice based on substantive rulings previously made by the Judge supervising the HT Mass Tort Litigation in Pennsylvania, there is no need for the duplicative Minnesota Action or its transfer to the MDL. Plaintiffs' *chose* the Pennsylvania forum in consultation with their counsel. There is no question that the Pennsylvania Court is capable of resolving all issues relating to Plaintiffs' claims in the context of the Plaintiffs' election to participate in an HT Mass Tort Litigation that has been pending in that forum for more than three years, and there certainly is no need or justifiable reason to involve yet another court in this matter. To transfer the Minnesota Action at this juncture would defeat rather than

---

claims) and four years (with respect to strict liability and certain warranty claims). *See* Minn. Stat. § 541.05, subd. 1(5) and subd. 2. Thus, Plaintiffs' claims would also be time-barred under Minnesota's statutes of limitations.

serve the purposes of the MDL, as well as frustrating the coordination and management of the HT Mass Tort Litigation in Pennsylvania.

Indeed, allowing this transparent tactical maneuver will inevitably lead to a flood of dismissals without prejudice of many of the cases in the Pennsylvania Mass Tort Litigation vulnerable on statute of limitations grounds. Such a development will have the adverse effects of undermining the extensive case management work the Pennsylvania Court has already devoted to that matter over the past three years, gravely prejudice Wyeth by nullifying the value of the substantial expenditure of time and financial resources of participating in that litigation in good faith and obtaining pretrial rulings that are the subject of the pending Summary Judgment Motion, and will unnecessarily burden the Minnesota and MDL Courts with a host of cases that are already being handled in a well-managed Mass Tort Litigation matter before a competent and experienced state court. There is no reason to undermine the case management activities of the Pennsylvania Court in this way, and the CTO should be vacated with respect to the Minnesota Action in the interests of sound judicial administration, comity, and the efficient management of the Pennsylvania Mass Tort Litigation.

## II. PLAINTIFFS' DUPLICATIVE AND VEXATIOUS MINNESOTA ACTION IS THE SUBJECT OF A PENDING MOTION TO DISMISS OR STAY.

Plaintiffs' Minnesota Action is vexatious, duplicative and brought in bad faith, and transferring it to the Arkansas multidistrict litigation would not serve judicial efficiency or economy. While the Minnesota Action names a few additional Defendants, the numerous Wyeth Defendants are the same in both actions. More importantly, Plaintiffs' claim – that her HRT use caused her breast cancer – is essentially identical in both actions and the additional Defendants, named *seven years* after her diagnosis, are obviously a pretext to create some superficial distinction between the actions. The same five Wyeth entities named in the other Manalo actions

make up the majority of the Defendants, and even a cursory reading of the Minnesota Complaint makes clear that Plaintiffs' allegations are directed at the Wyeth Defendants.[3] Regardless of the motive for naming these parties at this juncture, their addition as Defendants does not affect Wyeth's right to have its position on statute of limitations determined by the Pennsylvania Court that has been effectively and efficiently handling this matter for more than three years in its HRT Mass Tort Litigation. The Panel should vacate its Transfer Order relating to the Minnesota Action.

The same day Plaintiffs improperly discontinued their Pennsylvania Action in the face of Wyeth's Summary Judgment Motion, they filed their third suit, the Minnesota Complaint, asserting the same claims alleged in both the Pennsylvania and New Jersey Actions. The very next day, unbeknownst to Wyeth, Plaintiffs' counsel "tagged" the Minnesota Action for transfer to the MDL. On November 28, 2007, Wyeth answered in the Minnesota Action and filed a Motion to Dismiss and/or Stay that matter pending rulings by the Pennsylvania court on Wyeth's Petition to Strike Off Plaintiffs' Discontinuance and Motion for Summary Judgment.[4] The Pennsylvania court granted Wyeth's Petition and struck the discontinuance, thereby reinstating the Pennsylvania Action and allowing Wyeth to proceed with its Summary Judgment Motion on statute of limitations grounds. Thus, Wyeth's Motion to Dismiss and/or Stay in the Minnesota Action requests that the Minnesota Court abstain from exercising jurisdiction under the *Colorado*

---

[3] Mrs. Manalo's Minnesota Complaint mentions only one non-Wyeth HT product, Estropipate (not identified in the *Manalo* Pennsylvania Complaint), and then only as background information without any specific allegations against its alleged manufacturers.

[4] The Pennsylvania court granted Wyeth's Petition on December 7, 2007, reinstating the Pennsylvania Action to proceed with a ruling on the pending Summary Judgment Motion. (Hund Aff. Ex. G).

*River* abstention doctrine so as to allow the Pennsylvania Court, which is most familiar with the Pennsylvania Mass Tort Litigation, to decide the pending dispositive motion.[5]

Wyeth's Motion to Dismiss is based upon the U.S. Supreme Court's directive that a federal court may dismiss or stay an action in certain exceptional circumstances where there are concurrent state proceedings "for reasons of wise judicial administration." *Colorado River*, 424 U.S. at 817-818; *see Darsie v. Avia Group Int'l, Inc.*, 36 F.3d 743, 744-45 (8th Cir. 1994); *Mountain Pure, LLC v. Turner Holdings, LLC*, 439 F.3d 920, 924 (8th Cir. 2006). When there are parallel proceedings pending in state court, as there are in this instance,[6] the federal court balances the following factors in assessing whether to dismiss or stay the action in favor of the concurrent state proceedings:

(1)  the inconvenience of the federal forum;

(2)  the desirability of avoiding piecemeal litigation;

(3)  the order in which the state and federal courts obtained jurisdiction;

(4)  the source of the governing law (i.e., whether state or federal law controls);

(5)  the adequacy of the state court to protect the federal plaintiff's rights; and

(6)  the relative progress of the state and federal actions.

*Colorado River*, 424 U.S. at 818-19 (articulating factors #1 to #3); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 23, 26 (1983) (expanding test to include factors #4

---

[5] The non-Wyeth Defendants, not having been parties in either the Pennsylvania or New Jersey Actions, were unaware that Plaintiffs had a prior suit pending in Pennsylvania and were facing an adverse judgment in that Court based upon the statute of limitations. The non-Wyeth Defendants, then unaware of Plaintiffs' procedural maneuvering, entered into Stipulations with Plaintiffs whereby they agreed they would not have to answer pending transfer of the matter to the MDL Court in Arkansas. None of the non-Wyeth Defendants has objected to the Motion to Dismiss and/or Stay, the Notice of Opposition, or this Motion to Vacate CTO-122.

[6] Parallel suits need not be identical and require only that the two actions involve "substantially the same parties and issues." *Keever v. Dykema*, 2002 WL 273149, at *4 (D. Minn. Feb. 25, 2002) (concluding that, even though two parties in the federal case were not parties to the state court case, the parties were "sufficiently similar to be considered parallel").

to #6). The relevant factors are to be applied in a flexible and pragmatic manner. *Cone*, 460 U.S. at 16, 21 ("the weight to be given to any one factor may vary greatly from case to case").[7]

The factors evaluated under the *Colorado River* abstention doctrine also serve to promote judicial efficiency and economy. Should the Minnesota Court grant Wyeth's Motion to dismiss or stay the Minnesota Action, which Wyeth believes it will, its transfer to the MDL is moot. In this case, all of the factors weigh in favor of the Minnesota federal court abstaining and deferring to the Pennsylvania Action and, in turn, vacating the Conditional Transfer Order.

## A.    The inconvenience of the federal forum.

Given that Plaintiffs were at all relevant times Illinois residents, and the other late-named Defendants do not have their principal place of business in Pennsylvania, Minnesota or Arkansas, the inconvenience to them of litigating the case in Pennsylvania is not mitigated by the Minnesota court retaining jurisdiction or transferring the case to the MDL, making this factor neutral as to those parties. However, several of the Wyeth Defendants have their principal places of business in Pennsylvania and it is, indeed, likely that several current and former Wyeth employees that may be witnesses are located in Pennsylvania, while none are located in Minnesota or Arkansas. The Pennsylvania court has the availability of compulsory process for attendance of such current or former Wyeth employees, whereas the Minnesota court would not. It would be less convenient to the Wyeth Defendants, who are clearly the prime targets of Plaintiffs' claims, to litigate this matter in the Minnesota or MDL fora. Thus, this factor favors the Minnesota Court's abstention and this Panel vacating the transfer order. *E.g., Baseline*

---

[7] Some courts have considered yet additional factors as part of the balancing test, including whether the plaintiff in the federal suit is forum shopping and whether the federal action is vexatious or reactive in nature. *See e.g., id.* at 17, n. 20; *Am. Int'l Underwriters, (Philippines), Inc. v. Continental Ins. Co.*, 843 F.2d 1253, 1259 (9th Cir. 1988) (holding that it is appropriate to assess forum shopping); *Baseline Sports, Inc. v. Third Base Sports*, 341 F. Supp. 2d 605, 611 (E.D. Va. 2004).

*Sports, Inc.*, 341 F. Supp. 2d at 610 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

### B.    The desirability of avoiding piecemeal litigation.

The second factor for consideration of abstention, and a purpose of multidistrict litigations, is the desirability of avoiding piecemeal litigation.  If the Minnesota Court (or the MDL) exercises jurisdiction, two actions will go forward.  If the Minnesota Court declines to proceed, only the Pennsylvania Action (Plaintiffs having voluntarily dismissed their New Jersey Action "to pursue their claims in the Pennsylvania state court") would remain, where Wyeth already has a pending summary judgment motion based upon the statute of limitations.

The state court and federal court allegations in both cases are essentially the same.  In *Baseline Sports, Inc.*, the district court held:

> The existence of parallel (in fact, nearly identical) state and federal proceedings is wasteful of judicial resources.  Although 'judicial diseconomy' alone does not justify abstention, in this case the judicial diseconomy is the product of a reactive, vexatious lawsuit.  Such disregard for judicial time and resources should not, and need not, be tolerated.  Furthermore, this duplicative litigation will no doubt present serious res judicata problems for either this court or the Georgia [state] court, depending on which court first reaches the merits of the dispute.  This factor weighs strongly in favor of abstention.

341 F. Supp. 2d at 610-11.  As in *Baseline Sports, Inc.*, this factor also favors the Minnesota Court's abstention and this Panel vacating the transfer order.

### C.    The order in which jurisdiction was obtained.

The Pennsylvania court obtained jurisdiction over three years ago when Plaintiffs' elected to file their case there in June of 2004, long before the 2007 Minnesota Action.  This case has been part of the Pennsylvania HRT Mass Tort Litigation for over three years and subject to that court's various pretrial orders and discovery proceedings.  Now, three years later, when faced with Wyeth's Summary Judgment Motion based upon the Pennsylvania court's prior

statute of limitations ruling, Plaintiffs filed their case a third time, in Minnesota. This factor, therefore, weighs heavily in favor of dismissal of the Minnesota Action and this Panel vacating the transfer order. *Baseline Sports, Inc.*, at 610.

**D.      Adequacy of the state court action to protect the rights of the parties.**

Where the state forum provides adequate protection to the plaintiff in the federal suit, abstention is favored. *Enfission, Inc. v. Leaver*, 408 F. Supp. 2d 1093, 1100 (W.D. Wash. 2005); *Darsie v. Avia Group Int'l, Inc.*, 1994 WL 581525, at *3 (D. Minn. Mar. 1, 1994), *aff'd*, 36 F.3d 743 (8th Cir. 1994). State law governs all of Plaintiffs' claims and there is no question that the Pennsylvania court can provide adequate protection to Plaintiffs. Therefore, this factor also weighs in favor of abstention and this Panel vacating the transfer order.

**E.      Source of governing law.**

State law clearly governs all of the claims raised in the Manalo actions. There are no federal claims in this matter. The presence of state law issues and the absence of any federal claims weigh in favor of abstention in this case and the Panel vacating the transfer order. *See Darsie v. Avia Group Int'l, Inc.*, 36 F.3d 743, 745 (8th Cir. 1994) (affirming district court's finding that it was not in a better position to interpret state law than state courts and that no federal issues were involved favored dismissal of the federal action); *Garber v. Sir Speedy, Inc.*, 930 F. Supp. 267, 270 (N.D. Tex. 1995) (finding this factor favored staying federal court action because state law provided rules of decision).

**F.      Relative progress of state and federal actions.**

This factor also weighs in favor of dismissal and vacating the transfer order because, while the Pennsylvania case has not progressed to trial, it has progressed further than the Minnesota Action. The Pennsylvania case has been part of the Philadelphia court's HRT Mass

11

Tort Litigation for over three years and has been subject to that court's pretrial orders and rulings that apply collectively to plaintiffs in that litigation. This includes, specifically, the Pennsylvania court's ruling that Pennsylvania's two year statute of limitations applies to claims in that Mass Tort Litigation. Plaintiffs seek to avoid Wyeth's pending summary judgment motion based upon that adverse ruling by bringing their claims in the Minnesota court. Plaintiffs' Minnesota Action is in its infancy. The more advanced posture of the Pennsylvania state court action clearly favors dismissal of the Minnesota Action and the Panel vacating the transfer order. *Darsie v. Avia Group Int'l, Inc.*, 1994 WL 581525, at *3 (D. Minn. Mar. 1, 1994), *aff'd*, 36 F.3d 743 (8th Cir. 1994). Transferring the case to the MDL would be a waste of judicial resources and would defeat the purposes of multidistrict litigation.

## III.    OTHER FACTORS FAVORING ABSTENTION AND VACATING THE CONDITIONAL TRANSFER ORDER.

Although not explicitly a factor enunciated by the Supreme Court, some federal courts consider forum shopping in evaluating whether to dismiss or stay a federal case in favor of a pending state court proceeding. *Enfission, Inc.*, 408 F. Supp. 2d at 1100. "In the *Colorado River* context, forum shopping is improper when a party 'seeks to avoid adverse rulings made by the state court or to gain a tactical advantage from application of federal court rules.'" *Id.* As another example, in *American International Underwriters*, the court affirmed the district court's finding that plaintiff was forum shopping by filing a "repetitive" suit in federal court. 843 F. 2d at 1259. There, the Ninth Circuit opined that forum shopping "is appropriate to consider given the flexible and pragmatic way in which abstention is to be applied" and that discouraging unproductive and wasteful forum shopping promoted "wise judicial administration" as contemplated in *Colorado River*. *Id.*

As explained above, Plaintiffs' filing of this *third lawsuit* at this late date epitomizes forum shopping to avoid an adverse ruling and should not be condoned or rewarded. "Where courts find bad faith on the part of the plaintiff, a stay or dismissal may be warranted 'as a means to deter vexatious use of the courts.'" *Enfission, Inc.*, 408 F. Supp. 2d at 1100; *see, e.g. Federated Rural Elec. Inc. Co.*, 48 F.3d at 299 (recognizing the evaluation of the vexatious or reactive nature of the federal suit as an "additional aspect" of the *Colorado River* analysis). Thus, the "additional aspects" of Plaintiffs' blatant forum shopping and bad faith litigation favor dismissal of the Minnesota Action. They also favor vacating Conditional Transfer Order 122 because allowing this duplicative lawsuit to proceed through its transfer to the MDL would unfairly compromise the Pennsylvania Court's jurisdiction to resolve that case at a critical juncture in the litigation and would affirmatively frustrate the just and efficient resolution of these actions as opposed to advancing the salutary purposes of multidistrict litigation. 28 U.S.C. § 1407.

## CONCLUSION

Plaintiffs' Pennsylvania Action has been pending for over three years and is currently the subject of a dispositive motion. Allowing the reactive, duplicative Minnesota Action to go forward through its transfer to the Arkansas MDL would not advance the purposes multidistrict litigation and, in fact, would affirmatively frustrate the goals of avoiding duplicative discovery, preventing inconsistent pretrial rulings, and conserving judicial resources.

Therefore, the Wyeth Defendants respectfully request that the Panel grant the Motion to Vacate Conditional Transfer Order 122.

Respectfully submitted,

Dated: December 31, 2007

**BASSFORD REMELE**
*A Professional Association*

By:_____
Edward F. Fox (License #003132X)
Carrie L. Hund (License #277149)
33 South Sixth Street, Suite 3800
Minneapolis, Minnesota 55402-3707
Telephone: (612) 333-3000
Facsimile: (612) 333-8829

*ATTORNEYS FOR WYETH, WYETH PHARMACEUTICALS INC., WYETH-AYERST INTERNATIONAL INC., and WYETH PHARMACEUTICALS*

RECEIVED
CLERK'S OFFICE
2008 JAN -2 A 10: 04
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JAN - 2 2008

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**MDL DOCKET NO. 1507**

**IN RE PREMPRO PRODUCTS LIABILITY LITIGATION**

**AFFIDAVIT OF CARRIE L. HUND IN SUPPORT OF WYETH'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-122)**

STATE OF MINNESOTA )
                                          )ss.
COUNTY OF HENNEPIN )

Carrie L. Hund, being first duly sworn, states and deposes as follows:

1.      I am a shareholder in the firm of BASSFORD REMELE, A Professional Association, counsel in the above-captioned matter for Defendants Wyeth, Wyeth Pharmaceuticals Inc., Wyeth Pharmaceuticals and Wyeth-Ayerst International Inc. ("Wyeth Defendants").  I submit this Affidavit in support of the Wyeth Defendants' Motion to Vacate Conditional Transfer Order (CTO-122) with respect to the case styled *Graciana Manalo, et al. v. Wyeth, et al.*, Civ. No. 07-4557 (D. Minn.).

2.      Attached hereto and incorporated by reference as Exhibit A is a true and correct copy of Plaintiffs' July 2, 2004 Short Form Complaint in the Philadelphia Court of Common Pleas (the "Pennsylvania Action").  Plaintiff Graciana Manalo's June 29, 2004 Fact Sheet submitted in her Philadelphia Court of Common Pleas ("P.C.C.P.") case styled *Graciana Manalo, et al. v. Wyeth Pharmaceuticals, Inc., et al.*, P.C.C.P., June Term 2004, No. 004503.

3.      Attached hereto and incorporated by reference as Exhibit B is a true and correct copy of Plaintiffs' July 8, 2004 Plaintiffs' Complaint in Superior Court of New

Jersey, Law Division, Atlantic County, Docket No. ATL-L-2102-04 (the "New Jersey Action").

4.    Attached hereto and incorporated by reference as Exhibit C is a true and correct copy of Plaintiffs' Voluntary Dismissal Without Prejudice of the New Jersey Action.

5.    Attached hereto and incorporated by reference as Exhibit D is a true and correct copy of the Court's opinion in *Coleman v. Wyeth Pharmaceuticals Inc.*, 2002 WL 2791697 (Pa. Com. Pl. Sept. 24, 2007).

6.    Attached hereto and incorporated by reference as Exhibit E is a true and correct copy of the Affidavit of Andrew Trevelise, Wyeth's Counsel in the Pennsylvania Action, and electronic mail correspondence between Mr. Trevelise and Plaintiffs' counsel.

7.    Attached hereto and incorporated by reference as Exhibit F is a true and correct copy of Plaintiffs' *Praecipe* Notice for Discontinuance Without Prejudice of the Pennsylvania Action.

8.    Attached hereto and incorporated by reference as Exhibit G is a true and correct copy of the Pennsylvania Court's December 7, 2007 Order Striking Off Plaintiffs' Discontinuance in the Pennsylvania Action.

9.    Attached hereto and incorporated by reference as Exhibit H is a true and correct copy of Wyeth's Notice of Motion and Motion to Dismiss and/or Stay the Minnesota Action.

FURTHER YOUR AFFIANT SAYETH NOT.

Carrie L. Hund

Subscribed and sworn to before me
this 31st day of December, 2007.

Notary Public, Minnesota

MARY SUE ABBOTT
Notary Public
Minnesota
My Commission Expires January 31, 2010

2008 JAN -2 A 10: 04

CLERK'S OFFICE
RECEIVED

2

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JAN - 2 2008

FILED
CLERK'S OFFICE

STATE OF MINNESOTA )
                    ) ss.
COUNTY OF HENNEPIN )

      Service of the attached was made on **DECEMBER 31, 2007** upon the attorney(s) named below by mailing to him/her (them) a copy to his/her (their) last known address by the undersigned on behalf of BASSFORD REMELE, A Professional Association, as attorney of record in the said action.

<u>Service of</u>:

*Wyeth's Memorandum of Law in Support of Motion to Vacate CT0-122,*
*Affidavit of Carrie L. Hund in Support of Wyeth's Motion to Vacate CT0-122*
*with attached Exhibits and*
*Wyeth's Rule 5.3 Corporate Disclosure Statement*

<u>Attorney(s) Served</u>:

Andrew G. Finkelstein
Kenneth B. Fromson
Ronald Rosenkranz
**Finkelstein & Partners, LLP**
436 Robinson Avenue
Newburgh, NY 12550

Jan R. McLean Bernier
**Halleland, Lewis, Nilan & Johnson P.A.**
600 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, MN 55402

And Attached Service List

*Mary Que abbott*

Subscribed and sworn to before me
this 31st day of December, 2007.

*Tsha Marie Karen Houle*
Notary Public



TISHA MARIE KAREN HOULE
Notary Public-Minnesota
My Commission Expires Jan 31, 2012

2008 JAN -2 A 10: 04
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION
RECEIVED CLERK'S OFFICE

IN RE: PREMPRO PRODUCTS LIABILITY
LITIGATION

MDL No. 1507

## PANEL SERVICE LIST (Excerpted from CTO-122)

Garciana Manalo, et al. v. Wyeth, et al., D. Minnesota, C.A. No. 0:07-4557  (Judge James M. Rosenbaum)

Stacey L. Drentlaw
OPPENHEIMER WOLFF & DONNELLY LLP
3300 Plaza VII Building
45 South Seventh Street
Minneapolis, MN 55402

F. Lane Heard, III
WILLIAMS & CONNELLY LLP
Edward Bennett Williams Building
725 12th Street, N.W.
Washington, DC 20005-5901

Carrie L. Hund
BASSFORD REMELE PA
33 South 6th Street
Suite 3800
Minneapolis, MN 55402

Patrick Lysaught
BAKER STERCHI COWDEN & RICE LLC
2400 Pershing Road
Suite 500
Kansas City, MO 64108-2504

Russell Marlin
GARY EUBANKS & ASSOCIATES
P.O. Box 3887
Little Rock, AR 72203-3887

Gale Diane Pearson
PEARSON RANDALL & SCHUMACHER PA
1025 Fifth Street Towers
100 South Fifth Street
Minneapolis, MN 55402

Lyn Peeples Pruitt
MITCHELL WILLIAMS SELIG GATES &
WOODYARD PLLC
425 West Capitol Avenue
Suite 1800
Little Rock, AR 72201-3525

Michelle L. Rognlien Gilboe
BOWMAN & BROOKE
150 South Fifth Street
Suite 3000
Minneapolis, MN 55402-4244

Alan E. Rothman
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022-3598

Gina M. Saelinger
ULMER & BERNE LLP
600 Vine Street
Suite 2800
Cincinnati, OH 45202



JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JAN - 2 2008

FILED
CLERK'S OFFICE

Court of Common Pleas of Philadelphia County
Trial Division
Civil Cover Sheet

JUNE 2004    004503

| PLAINTIFF'S NAME **Graciana Manalo** | DEFENDANT'S NAME Wyeth Pharmaceuticals, Inc. |
|---|---|
| PLAINTIFF'S ADDRESS 4036 Harvard Terrace Skokie IL 60076 | DEFENDANT'S ADDRESS 500 ARCOLA DRIVE COLLEGEVILLE, PA 19426 |
| PLAINTIFF'S NAME Felipe Manalo | DEFENDANT'S NAME Wyeth-Ayerst Pharmaceuticals Inc. |
| PLAINTIFF'S ADDRESS 036 Harvard Terrace Skokie IL 60076 | DEFENDANT'S ADDRESS 500 ARCOLA DRIVE COLLEGEVILLE, PA 19426 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME Wyeth Ayerst International Inc. |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS 2704 Commerce Drive Harrisburg, PA 17110 |

| TOTAL NUMBER OF PLAINTIFFS TWO (2) | TOTAL NO. OF DEFENDANTS SIX (6) | COMMENCEMENT OF ACTION X Complaint    ☐ Petition Action    ☐ Notice of Appeal ☐ Writ of Summons    ☐ Transfer From Other Jurisdictions |
|---|---|---|

| AMOUNT IN CONTROVERSY ☐ $50,000.00 or less ☒ More than $50,000.00 | COURT PROGRAMS ☐ Arbitration    ☒ Mass Tort HORMONE THERAPY    ☐ Commerce    ☐ Settlement X Jury    ☐ Savings Action    ☐ Minor Court Appeal    ☐ Minors ☐ Non-Jury    ☐ Petition    ☐ Statutory Appeals    ☐ W/D/Survival ☐ Other: |
|---|---|

CASE TYPE AND CODE (SEE INSTRUCTIONS)    **MASS TORT — HORMONE THERAPY**

STATUTORY BASIS FOR CAUSE OF ACTION (SEE INSTRUCTIONS)

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) N/A | IS CASE SUBJECT TO COORDINATION ORDER? Yes ☐    No ☒ |
|---|---|

TO THE PROTHONOTARY:
Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant:
Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S /APPELLANT'S ATTORNEY TOBIAS L. MILLROOD, ESQUIRE STEVEN D. RESNICK, ESQUIRE | ADDRESS (SEE INSTRUCTIONS) SCHIFFRIN & BARROWAY, LLP Three Bala Plaza East, Suite 400 Bala Cynwyd, PA 19004 |
|---|---|
| PHONE NUMBER (610) 667-7706    FAX NUMBER (610) 667-7056 | |
| SUPREME COURT IDENTIFICATION NO. 77764/86927 | E-MAIL ADDRESS tmillrood@sbclasslaw.com/sresnick@sbclasslaw.com |
| SIGNATURE | DATE 6/30/04 |

**EXHIBIT A**

| Court of Common Pleas of Philadelphia County Civil Division | For Prothonotary Use Only (Docket Number) |
|---|---|
| PLAINTIFF'S NAME | DEFENDANT'S NAME<br>WYETH LABORATORIES INC. |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS<br>1300 WOLF STREET<br>PHILADELPHIA, PA 19148 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME<br>WYETH PHARMACEUTICALS |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS<br>500 ARCOLA DRIVE<br>COLLEGEVILLE, PA 19426 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME<br>WYETH, INC. |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS<br>FIVE GIRALDA FARMS<br>MADISON, NJ 07940 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |

**ATTEST**

JUL 0 2 2004    JURY FEE PAID

µS

#217327-06

| FINKELSTEIN & PARTNERS, LLP | SCHIFFRIN & BARROWAY, LLP |
|---|---|
| By:    Andrew Finkelstein, Esquire<br>        Kenneth Fromson, Esquire<br>        Ronald Rosenkranz, Esquire<br>436 Robinson Avenue<br>Newburgh, New York  12550<br>(845) 562-0203<br><br>**Attorneys for Plaintiff(s)** | By:    Tobias L. Millrood, Esquire<br>        Steven Resnick, Esquire<br>        Hal J. Kleinman, Esquire<br>Attorney I.D. Nos.: 77764/86927/92702<br>Three Bala Plaza East, Suite 400<br>Bala Cynwyd, Pennsylvania, 19004<br>(610) 667-7706<br>**Attorneys for Plaintiff(s)** |

| | |
|---|---|
| GRACIANA MANALO and<br>FELIPE MANALO,<br><br>                            Plaintiff(s),<br>            v.<br><br>WYETH PHARMACEUTICALS,<br>INC., et al,<br>                            Defendant(s). | :     COURT OF COMMON PLEAS OF<br>:           PHILADELPHIA COUNTY<br>:<br>:     JUNE 2004<br>:     _____ TERM, _____<br>:<br>:     NO.   004503<br>:<br>:<br>:     HORMONE THERAPY CASE<br>:<br>: |

## NOTICE TO PLEAD

NOTICE  You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER (OR CANNOT AFFORD ONE), GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. PHILADELPHIA COUNTY BAR ASSOCIATION · LAWYER REFERRAL AND INFORMATION SERVICE 1101 MARKET STREET, 11ᵀᴴ FLOOR PHILADELPHIA, PENNSYLVANIA 19107 TELEPHONE:  (215) 238-1701

THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

AVISO  Le han demandado en corte. Si usted quiere defenderse contra las demandas nombradas en las paginas siquientes, tiene veinte (20) dias a partir de recibir esta demanda notificacion para entablar personalmente o por un abogado una comparesencia escrita y tambien para entablar con la corte en forma escrita sus defensas y objeciones a las demandas contra usted sin previo aviso para conseguir el deniro demandado en el pleito o para conseguir cualquier otra demanda o alivio solicitados por el demandante.  Usted puede perder dinero o propiendad u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE. SI USTED NO TIENE ABOGADO (O NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO) VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA · NOMBRADA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASSISTENCIA LEGAL. ESTA OFICINA PUEDE PROPORCIONARLE LA INFORMACION SOBRE CONTRATAR A UN ABOGADO.
ASOCIACION DE LICENCIADOR DE PHILADELPHIA VICIO DE REFERENCIA DE INFORMACION LEGAL 1101 MARKET STREET, 11ᵀᴴ FLOOR PHILADELPHIA, PENNSYLVANIA 19107 TELEFONO: (215) 238-1701

SI USTED NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO, ESTA OFICINA PUEDE PROPORCION INFORMACION COBRE AGENCIAS QUE OFRECEN SERVICIOS LEGALES A PERSONAS QUE CUMPLEN LOSE REQUISITOS PARA UN HONORARIO REDUCIDO O NINGUN HONORARIO.

1        MASS TORT: HORMONE THERAPY

| FINKELSTEIN & PARTNERS, LLP | SCHIFFRIN & BARROWAY, LLP |
|---|---|
| By:  Andrew Finkelstein, Esquire<br>     Kenneth Fromson, Esquire<br>     Ronald Rosenkranz, Esquire<br>436 Robinson Avenue<br>Newburgh, New York  12550<br>(845) 562-0203<br><br>**Attorneys for Plaintiff(s)** | By:  Tobias L. Millrood, Esquire<br>     Steven Resnick, Esquire<br>     Hal J. Kleinman, Esquire<br>Attorney I.D. Nos.: 77764/86927/92702<br>Three Bala Plaza East, Suite 400<br>Bala Cynwyd, Pennsylvania, 19004<br>(610) 667-7706<br>**Attorneys for Plaintiff(s)** |

| | |
|---|---|
| **GRACIANA MANALO and<br>FELIPE MANALO,**<br><br>          Plaintiff(s),<br><br>     v.<br><br>**WYETH PHARMACEUTICALS,<br>INC., et al,**<br><br>          Defendant(s). | :  **COURT OF COMMON PLEAS OF<br>:      PHILADELPHIA COUNTY**<br>:<br>:<br>:<br>: _____ TERM, _____<br>:<br>: **NO.** _____<br>:<br>:<br>: **HORMONE THERAPY CASE**<br>:<br>: |

## SHERIFF'S SERVICE LIST

**WYETH PHARMACEUTICALS, INC.**
500 Arcola Drive
Collegeville, Pennsylvania  19426

**WYETH-AYERST PHARMACEUTICALS INC.**
500 Arcola Drive
Collegeville, Pennsylvania  19426

**WYETH AYERST INTERNATIONAL INC.**
2704 Commerce Drive
Harrisburg, Pennsylvania  17110

**WYETH LABORATORIES INC.**
1300 Wolf Street
Philadelphia, Pennsylvania  19148

**WYETH PHARMACEUTICALS**
500 Arcola Drive
Collegeville, Pennsylvania  19426

| FINKELSTEIN & PARTNERS, LLP | SCHIFFRIN & BARROWAY, LLP |
|---|---|
| By:    Andrew Finkelstein, Esquire<br>        Kenneth Fromson, Esquire<br>        Ronald Rosenkranz, Esquire<br>436 Robinson Avenue<br>Newburgh, New York  12550<br>(845) 562-0203<br><br>**Attorneys for Plaintiff(s)** | By:    Tobias L. Millrood, Esquire<br>        Steven Resnick, Esquire<br>        Hal J. Kleinman, Esquire<br>Attorney I.D. Nos.: 77764/86927/92702<br>Three Bala Plaza East, Suite 400<br>Bala Cynwyd, Pennsylvania, 19004<br>(610) 667-7706<br>**Attorneys for Plaintiff(s)** |

| | |
|---|---|
| **GRACIANA MANALO and FELIPE MANALO,**<br><br>                                Plaintiff(s),<br>                v.<br><br>**WYETH PHARMACEUTICALS, INC., et al,**<br>                                Defendants. | :  **COURT OF COMMON PLEAS OF**<br>:       **PHILADELPHIA COUNTY**<br>:<br>:<br>:<br>:  _____ TERM, _____<br>:<br>:  NO. _____<br>:<br>:  **HORMONE THERAPY CASE**<br>:<br>: |

## DEFENDANTS LIST

**WYETH PHARMACEUTICALS, INC.**
500 Arcola Drive
Collegeville, Pennsylvania  19426

**WYETH-AYERST
PHARMACEUTICALS INC.**
500 Arcola Drive
Collegeville, Pennsylvania  19426

**WYETH AYERST
INTERNATIONAL INC.**
2704 Commerce Drive
Harrisburg, Pennsylvania  17110

**WYETH LABORATORIES INC.**
1300 Wolf Street
Philadelphia, Pennsylvania  19148

**WYETH PHARMACEUTICALS**
500 Arcola Drive
Collegeville, Pennsylvania  19426

**WYETH, INC.**
5 Giralda Farms
Madison, New Jersey  07940

3

| FINKELSTEIN & PARTNERS, LLP | SCHIFFRIN & BARROWAY, LLP |
|---|---|
| By:  Andrew Finkelstein, Esquire<br>      Kenneth Fromson, Esquire<br>      Ronald Rosenkranz, Esquire<br>436 Robinson Avenue<br>Newburgh, New York  12550<br>(845) 562-0203<br><br>**Attorneys for Plaintiff(s)** | By:  Tobias L. Millrood, Esquire<br>      Steven Resnick, Esquire<br>      Hal J. Kleinman, Esquire<br>Attorney I.D. Nos.: 77764/86927/92702<br>Three Bala Plaza East, Suite 400<br>Bala Cynwyd, Pennsylvania, 19004<br>(610) 667-7706<br>**Attorneys for Plaintiff(s)** |

| | |
|---|---|
| GRACIANA MANALO and<br>FELIPE MANALO,<br><br>                Plaintiff(s),<br>    v.<br><br>WYETH PHARMACEUTICALS,<br>INC., et al,<br>                Defendant(s). | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

COURT OF COMMON PLEAS OF
PHILADELPHIA COUNTY


_____ TERM, _____

NO. _____


**HORMONE THERAPY CASE**

## CIVIL ACTION COMPLAINT - SHORT FORM

Plaintiffs incorporate by reference Plaintiffs' Master Long Form

Complaint in In Re: Hormone Therapy ("HT") Litigation in Philadelphia County Court of

Common Pleas, filed as of November 18, 2003, under Master Docket Number, November

2003, No. 0001.  Pursuant to an Order by the Honorable Norman Ackerman, Philadelphia

County Court of Common Pleas, the following Short Form Complaint is utilized in this

HT action.

Plaintiffs select and indicate by checking off the appropriate spaces, those

products, parties and claims that are specific to her or his case.  Where certain claims

require, pursuant to Pennsylvania law, specific pleading or case specific facts and

individual information, plaintiffs shall add and include them herein.

4

1.    Plaintiff is an individual who resides at 4036 Harvard Terrace, Skokie, in the State of Illinois (hereinafter referred to as the "Plaintiff").

Plaintiff's social security number is 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, and her date of birth is December 18, 1941.

2.    Plaintiff claims the following HT medications caused her injury:

Prempro.

3.    Plaintiff was prescribed the following HT medications for the following time frames by the doctors listed below:

| Medication | Start Date | End Date | Prescriber |
|---|---|---|---|
| Prempro | 1996 | 11/2000 | Dr. L. Dacanay |

4.    Plaintiff was diagnosed in November, 2000, by Dr. Mark Connolly, as having breast cancer, requiring lumpectomy, right breast.

4a.    Plaintiff first learned that her injuries described therein were related to the ingestion of an HT medication or about July 9, 2002, when the results of the WHI Prempro study were widely publicized in the National media.

5.    Plaintiff-spouse, Felipe Manalo, (hereinafter referred to as "Spouse") is an individual residing at the above address and claims damages as a result of:

__XX__ Loss of Consortium

_____ Wrongful Death

Spouse's social security number is #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 and his date of birth is August 29, 1946.

5

6.    The following entities are named as defendants and the allegations with regard thereto in the Master Complaint are herein adopted by reference:

**(Check appropriate defendants)**

_XX_    Wyeth Pharmaceuticals, Inc.

_XX_    Wyeth-Ayerst Pharmaceuticals Inc.

_XX_    Wyeth Ayerst International Inc.

_XX_    Wyeth Laboratories Inc.

_XX_    Wyeth Pharmaceuticals

_XX_    Wyeth, Inc.

_____    Pharmacia & Upjohn, Inc.
          a/k/a Pharmacia & Upjohn Company

_____    Pfizer Inc.

_____    Greenstone Ltd.

_____    Barr Laboratories, Inc.

_____    Others (Specify): _____.

7.    The following claims asserted in the Master Complaint and the allegations with regard thereto in the Master Complaint, are herein adopted by reference:

_XX_    Count I:          Negligence (Against the Wyeth Defendants)

_____ Count II:        Negligence (Against the MPA Defendants)

_XX_    Count III:        Fraud (Against the Wyeth Defendants)

_____ Count IV:        Fraud (Against the MPA Defendants)

_XX_    Count V:          Breach of Express Warranty (Against the Wyeth Defendants)

_____ Count VI:        Breach of Express Warranty (Against the MPA Defendants)

6

_____ Count VII:    Wrongful Death (Against all Defendants)

_____ Count VIII:    Survival Action (Against all Defendants)

___XX___ Count IX:    Loss of Consortium (Against all Defendants)

___XX___ Count X:    Corporate Responsibility: Joint Ventures, Parent/Subsidiaries, And/Or Successor Corporation (Against the Wyeth Defendants)

_____ Count XI:    Corporate Responsibility: Joint Ventures, Parent/Subsidiaries, And/Or Successor Corporation (Against the MPA Defendants)

## VERIFICATION

I, _Graciana Manalo_, hereby state:

1.  I am the plaintiff in this action;

2.  I verify that the statements made in the foregoing Short Form Complaint are true and correct to the best of my knowledge, information and belief; and

3.  I understand that the statements in the Complaint are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

_____
GRACIANA MANALO, Plaintiff

_6-22-04_____
Date

9

**VERIFICATION**

I, _Felipe Manalo_ , hereby state:

4.  I am the plaintiff in this action;

5.  I verify that the statements made in the foregoing Short Form

Complaint are true and correct to the best of my knowledge, information and belief; and

6.  I understand that the statements in the Complaint are made subject to

the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

_____
FELIPE MANALO, Plaintiff

_6-22-04_
Date

10

Esther Berezofsky, Esquire
WILLIAMS, CUKER & BEREZOFSKY
Woodland Falls Corporate Center
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
856-667-0500
*Counsel for Plaintiffs*

(Additional Counsel Appear on Signature Page)

**RECEIVED and FILED**

JUL  8 2004

**ATLANTIC COUNTY LAW DIVISION**

|  |  |  |
|---|---|---|
| Graciana Manalo<br>4036 Harvard Ter.<br>Skokie, IL 60076 | ) ) ) ) | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br><br>ATLANTIC COUNTY |
| Felipe M. Manalo<br>4036 Harvard Ter.<br>Skokie, IL 60076<br>(w/h) | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | DOCKET NO. *ATL-L-2102-04* |
| v. | ) ) ) | |
| Wyeth, Inc.<br>5 Giralda Farms<br>Madison, NJ | ) ) ) ) | |
| Wyeth Pharmaceuticals, Inc.,<br>500 Arcola Drive<br>Collegeville, PA | ) ) ) ) | COMPLAINT AND<br>JURY TRIAL DEMAND |
| Jane Does Distributors (1-50), | ) ) | |
| Jill Does Manufacturers (1-50), | ) ) | |
| Jack Does Wholesalers (1-50), | ) ) | |
| Jake Does Sellers (1-50), | ) ) | |
| John Does Marketers (1-50), | ) ) | |
| Joan Does Formulators (1-50), | ) | |

1

**EXHIBIT B**

|  |  |
|---|---|
| Jim Does Health Care Providers (1-50), | ) |
|  | ) |
| Jean Does (1-50), | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## PLAINTIFF'S COMPLAINT

NOW COMES Plaintiffs Graciana Manalo and Felipe Manalo, wife and husband, by and through their attorneys, and complaining against the Defendants: Wyeth Pharmaceuticals, Inc., Wyeth, Inc. (collectively "Wyeth Defendants"); and Jane Does Distributors (1-50), Jill Does Manufacturers (1-50), Jack Does Wholesalers (1-50), Jake Does Sellers (1-50), John Does Marketers (1-50), Joan Does Formulators (1-50), Jim Does Healthcare Providers (1-50), Jean Does (1-50), (collectively "Doe Defendants"), as follows:

## I. PARTIES

1.    Plaintiff Graciana Manalo is a resident of the State of Illinois residing at 4036 Harvard Ter., Skokie, IL, 60076. Plaintiff ingested the Defendants' Hormone Therapy Product: Prempro, from 1996 until 2000. Plaintiff developed breast cancer. The results of Plaintiff's breast cancer pathology test were reported on January 16, 2001. Plaintiff has suffered permanent disfigurement, pain, suffering and other damages as a result of her injuries.

2.    Plaintiff Felipe Manalo (hereinafter referred to as "Plaintiff Spouse") is the husband of Plaintiff and is a resident of the State of Illinois residing at 4036 Harvard Ter., Skokie, IL, 60076.

2

3.      Defendant Wyeth, Inc., is a Delaware corporation headquartered and with a principal place of business at 5 Giralda Farms, Madison, New Jersey. At all times relevant hereto, Wyeth, Inc., was engaged in, *inter alia*, the business of testing, manufacturing, labeling, marketing, distributing, promoting, and selling Hormone Therapy Products, including Premarin, Prempro, Premphase, and medroxyprogesterone acetate ("MPA") (hereinafter referred to as "Hormone Therapy Products"). The authorized service agent for Wyeth, Inc., is Prentice Hall Corp. Systems, 830 Bear Tavern Road, Trenton, New Jersey 08628. Wyeth Pharmaceuticals, Inc. and Wyeth, Inc. are referred to herein as the "Wyeth Defendants."

4.      Defendant Wyeth Pharmaceuticals, Inc., is a Delaware corporation with a principal place of business at 500 Arcola Drive Collegeville, Pennsylvania, duly authorized to conduct/transact and do business in the State of New Jersey. At all times relevant hereto, Wyeth Pharmaceuticals, Inc., was engaged in, *inter alia*, the business of testing, manufacturing, labeling, marketing, distributing, promoting, and selling Hormone Therapy Products, including Premarin, Prempro, Premphase, and medroxyprogesterone acetate (hereinafter referred to as "Hormone Therapy Products"). The authorized service agent for Wyeth Pharmaceuticals, Inc. is Corporation Service Company, 2704 Commerce Drive, Harrisburg, PA 17110.

5.      At all times relevant hereto, Defendants Jane Does Distributors (1-50) *(hereinafter "distributor Defendant")*, Jill Does Manufacturers (1-50) *(hereinafter "manufacturer Defendant")*, Jack Does Wholesalers (1-50) *(hereinafter "wholesaler Defendant")*, Jake Does Sellers (1-50) *(hereinafter "seller Defendant")*, John Does Marketers (1-50) *(hereinafter "marketer Defendant")*, Joan Does Formulators (1-50) *(hereinafter*

3

*"formulator Defendant")* are fictitious entities who manufactured, marketed, distributed and/or promoted and/or sold the Hormone Therapy Products.

6.    Defendant, Jim Does Healthcare Providers (1-50) *(hereinafter "healthcare Defendant")* are fictitious healthcare providers including, but not limited to, physicians, pharmacies, healthcare facilities, and clinics, who at all times relevant hereto either promoted the use of, distributed or otherwise supplied and/or prescribed to Plaintiff and otherwise made available Hormone Therapy Products to consumers.

7.    Defendant, Jean Does (1-50), by and through its subsidiaries, are presently unknown individuals, entities and/or corporations who were involved, in any manner, with Hormone Therapy Products.

## II. FACTUAL BACKGROUND

8.    Since the first estrogen pill was introduced in 1942, makers of synthetic sex hormones, a/k/a hormone "replacement" therapy or Hormone Therapy Products, have made claims for these drugs that *were never* backed by scientific evidence. Early advertising promoted by drug-makers to persuade doctors to prescribe synthetic hormone treatments were a blend of homespun medical wisdom and paternalism, playing on older women's fears. As this excerpt from a 1972 film by Ayerst (Wyeth's predecessor) touts:

> The physical alterations that are associated with the menopause may induce emotional changes. When a woman develops hot flashes, sweats, wrinkles on her face, she is quite concerned that she is losing her youth -- that she may indeed be losing her husband.

4

9.    The recent and largest study of menopausal women ever conducted, the Million Women Study in the United Kingdom, found a doubling of the overall rate of breast cancer in current users of synthetic hormone drugs. The authors calculated that post menopausal use of synthetic hormone drugs had caused an excess of 20,000 breast cancers in the U.K. alone in the last ten years. The US population of postmenopausal women using Hormone Therapy Products is approximately five times larger, meaning that Hormone Therapy Products have caused at least 100,000 unnecessary breast cancers in the U.S. in the last ten years. Importantly, these figures are limited to women under age 65. Thousands of additional unnecessary breast cancer cases were caused in older women, as well.

10.    Hormone "Replacement" Therapy ("HT" or "HRT") most commonly refers to the combination of both conjugated estrogens (estrogen) and progesterone (progestin). Estrogen used alone is sometimes known as Estrogen "Replacement" Therapy, ("ET" or "ERT") estrogen alone, or estrogen unopposed. HT and ET are prescription therapies provided to women during and after menopause. HT is prescribed to women who have made the natural transition to menopause through the aging process. ET is prescribed to women who have had a surgical menopause through hysterectomy. In general, hormone therapy is an umbrella term that is used to refer to either the use of combination hormone therapy (that is, estrogen and progesterone) or to the use of estrogen alone.

11.    Menopause is the cessation of menstruation caused by declining levels of estrogen and progesterone. It is a natural phenomenon -- a page of the female reproductive aging process -- not a disease. Symptoms, which vary in severity from woman to woman, may include hot flashes, chills, vaginal dryness, headache and irritability. Adverse consequences of the drop in

5

estrogen levels which begin with menopause and continue after menopause include, *inter alia*, vaginal atrophy and dryness, an increase in LDL cholesterol levels, and a decrease in bone density with resultant increased risk of osteoporosis.

12.    Menopause is a major issue in the lives of millions of women. Natural menopause comes at a time when women are relatively young at an average of 51 (usually between 46 and 62) when most American women live to an average age of 80. As a result, the consequences of menopause are felt for years after the menopause begins.

13.    There are an estimated 50 million post-menopausal women in the United States. In July 2002, approximately 38% of postmenopausal women in the United States used estrogen or hormone replacement therapy.

14.    The symptoms and consequences of menopause have been described in scientific literature since the late 1800s, and by the turn of the 20 century, the search of an aid to alleviate them was widely pursued.

15.    The FDA originally approved estrogen drugs only to relieve menopausal symptoms, such as hot flashes and vaginal atrophy. Defendants, however, have long touted alleged additional benefits of their Hormone Therapy Products beyond those specifically approved by the FDA.

16.    The safety and benefits of Estrogen Therapy were called into doubt following a 1976 study published in the *New England Journal of Medicine* evidencing a causal relationship between estrogen and endometrial cancer. Sales of estrogen products plummeted as physicians stopped prescribing estrogen for women except to those who had hysterectomies and therefore were not at risk for endometrial cancer.

6

17.   A 1980 medical article suggested a solution.  Dr. Don Gambrell, a reproductive endocrinologist, reported in the journal *Obstetrics and Gynecology* that adding progestin to estrogen led to a decline in endometrial cancer.  Defendants thus produced and marketed progestin (*i.e.*, synthetic progesterone or medroxyprogesterone acetate) as an adjunct to estrogen hormone therapy to protect against the risk of endometrial cancer.

18.   The Wyeth Defendants have manufactured, marketed, and distributed medroxyprogesterone acetate for use in combination with their estrogen products under trademarked brand names such as Prempro.

19.   Defendants vigorously promoted their Hormone Therapy Products to physicians, as well as consumers.  Defendant's direct-to-consumer ("DTC") marketing efforts included overt advertising pieces, such as print advertisements, videotapes, and brochures directed to consumers, as well as "product placement" efforts in which Hormone Therapy Products are favorably positioned in entertainment vehicles or favorably described in the popular press by hired spokespersons.

20.   The thrust of Defendants' marketing efforts has been to create a lifelong demand for their hormone therapy products and a belief by physicians that the prescription is beneficial to menopausal and post-menopausal women.

21.   For years, Defendants promoted estrogen and progestin hormone therapy to be drugs of prevention.  Indeed, Defendants originally contended that the prevention of osteoporosis and heart disease were two of the main long-term benefits for taking hormone therapy.

22.   Two large cohort studies concluded that the risks of hormone therapy outweighed the benefits for most women.

7

23.     The Defendants recklessly and willfully failed to conduct adequate pre-approval research and post-approval surveillance to establish the safety of long-term hormone therapy. Nonetheless, the Defendants had promoted long-term hormone therapy use vigorously.  Had the Defendants conducted the necessary studies and diligent post-marketing surveillance, the Defendants would have learned years ago that hormone therapy causes cardiovascular diseases, is marginally effective in preventing bone loss, does not promote well-being, causes a number of cancers and dementia, and is even harmful on a short-term basis by increasing the risk of breast cancer.

24.     Defendants were aware that their medroxyprogesterone acetate would be taken by women as the progestin component of their combination hormone therapy.  As a result, Defendants made claims regarding the cardiovascular and other health benefits of taking their progestin drug in combination with estrogen that they knew or in the exercise of reasonable care should have known were false and misleading.

25.     Medroxyprogesterone acetate when used in combination hormone therapy has deleterious effects, including increasing the incidence of strokes, blood clots, heart attacks, breast cancers, and ovarian cancer.  In spite of marketing and distributing medroxyprogesterone acetate for use in combination hormone therapy, Defendants did not warn consumers of the serious adverse side effects of this form of hormone therapy.

26.     Defendants, in their manufacture of progestin, failed to conduct adequate pre-marketing clinical testing and research to determine the safety of medroxyprogesterone acetate when used in combination with estrogen.  Furthermore, Defendants, in their manufacture of progestin, failed to conduct adequate post-marketing surveillance to determine the safety of

8

medroxyprogestrone acetate when used in combination with estrogen. Nevertheless. Defendants never disclosed on their warning labels that such testing had not been performed, thereby fraudulently inducing physicians and patients alike to use their drugs with the false assumption that such drugs had been sufficiently tested.

### III. FRAUDULENT CONCEALMENT

27. Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of the facts as alleged herein by Defendants. Plaintiff has been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff could not reasonably have discovered the dangerous nature of and unreasonable adverse side effects associated with Hormone Therapy Products prior to the filing of this Complaint.

28. The Defendants are and were under a continuing duty to disclose the true character, quality, and nature of their Hormone Therapy Products to the Plaintiff. Because of their concealment of the true character, quality and nature of their Hormone Therapy Products, the Defendants are estopped from relying on any statute of limitations defense.

### IV. CAUSES OF ACTION

### COUNT I - NEGLIGENCE

29. Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if the same were set forth more fully herein.

30. At all relevant times, the Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce Hormone Therapy Products, and at all times had a duty to exercise

9

reasonable care in the research, development, design, testing, manufacturing, inspection, labeling, distribution, marketing, promotion, sale and release of Hormone Therapy Products into the stream of commerce, including a duty to ensure that these products were accompanied by adequate warnings and did not cause consumers to suffer from unreasonably dangerous side effects, including, without limitation, breast cancer.

31.    Defendants at all relevant times owed a duty to Plaintiff to a) conduct appropriate testing to determine whether and to what extent using the Hormone Therapy Products pose serious health risks, and b) warn persons such as Plaintiff that taking these hormone replacement products carry risk of various serious diseases to a significant percentage of their prospective and actual consumers such as Plaintiff, of injuries, including, without limitation, breast cancer.

32.    Despite the fact that Defendants knew or should have known that Hormone Therapy Products posed a serious risk of bodily harm to consumers, Defendants failed to exercise ordinary care in labeling, advertising and promoting these hormone products.

33.    Defendants were negligent in the research, development, design, testing, manufacture, inspection, labeling, distribution, marketing, promotion, sale and/or otherwise release of Hormone Therapy Products into the stream of commerce in that they:

a.    Failed to use due care in the designing, testing, and manufacturing of the medications so as to prevent the aforementioned risks to individuals when Hormone Therapy Products were being used.

b.    Failed to accompany their product with proper warnings regarding all possible adverse side effects associated with the use of Hormone Therapy

10

Products and the comparative severity and duration of such adverse effects;

c.  Failed to conduct adequate pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Hormone Therapy Products;

d.  Failed to provide adequate training and information to medical care providers for the appropriate use Hormone Therapy Products;

e.  Failed to warn the Plaintiff, prior to actively encouraging and promoting the sale and use of Hormone Therapy Products, either directly or indirectly, orally or in writing, about the adverse effects associated with the use of this drug, including but not limited to breast cancer necessitating lengthy surgery and/or doctor, clinic, or hospital visits;

f.  Were otherwise careless and/or negligent.

34.  Despite the fact that Defendants knew or should have known that Hormone Therapy Products caused unreasonable and dangerous medical conditions which many users would be unable to remedy by any means, Defendants continued to market the products to consumers including Plaintiff.

35.  Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

36.  As a direct and proximate result of the conduct of the Defendants as aforesaid, Plaintiff has suffered and continues to suffer serious and permanent physical, and emotional

11

injuries, have expended and will continue to expend large sums of money for medical care and treatment, have suffered and will continue to suffer economic loss, and have otherwise been physically, emotionally and economically injured.

WHEREFORE, Plaintiff demands judgment against each Defendant, individually, jointly and severally for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT II - VIOLATION OF NEW JERSEY PRODUCTS LIABILITY ACT
### N.J.S.A. S 2A:58, C-1 et. seq.

37.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if the same were set forth more fully herein.

38.    Defendants are manufacturers and/or supplier of Hormone Therapy Products, and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the product.

39.    The Hormone Therapy Products manufactured and/or supplied by Defendants were defective in design or formulation in that, when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation.

40.    The Hormone Therapy Products were expected to and did reach Plaintiff without substantial change in condition. Alternatively, the Hormone Therapy Products manufactured and/or supplied by Defendants were defective in design or formulation, in that when they left the

12

hands of the manufacturers and/or suppliers, they were unreasonably dangerous and more dangerous than an ordinary consumer would expect.

41.     The Hormone Therapy Products manufactured and/or supplied by Defendants were defective due to inadequate warning and/or inadequate clinical trials, testing and study, and inadequate reporting regarding the results of it.

42.     The Hormone Therapy Products manufactured and/or supplied by Defendants were defective due to inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risk of injury from their Hormone Therapy Products, they failed to provide adequate warnings to the medical community and women, and continued to promote the products as safe and effective.

43.     The Hormone Therapy Products were manufactured, distributed, tested, sold, marketed, advertised and represented defectively by the Defendants and as a direct and proximate cause of Defendants' defective design of their Hormone Therapy Products, Plaintiff ingested these products, and Plaintiff suffered and will continue to suffer personal injury and/or death.

44.     The Hormone Therapy Products manufactured and/or supplied by Defendants were not accompanied by proper warnings to physicians, the medical community and women regarding all possible adverse side effects associated with the use of their Hormone Therapy Products and the severity and duration of such adverse effects.

45.     The warnings and information given to the medical community and women did not accurately reflect the symptoms, scope or severity of the potential side effects.

46.     Defendants failed to perform adequate testing which would have shown that their Hormone Therapy Products possessed serious potential side effects with respect to which full and

13

proper warnings, accurately and fully reflecting symptoms, scope and severity, should have been made.

47.     The Hormone Therapy Products manufactured and/or supplied by Defendants were defective due to inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risk of injury and death from Hormone Therapy Products, they failed to provide adequate warnings to physicians or consumers. And despite their inadequate post-marketing warnings and instructions to physicians, the medical community, and consumers, Defendants continued to promote the products aggressively.

48.     Had adequate warnings or instructions been provided, the Plaintiff would not have taken the drugs as she did, and would not have suffered harmful side effects or death.

49.     The Hormone Therapy Products were manufactured, distributed, tested, sold, marketed, advertised and represented defectively by the Defendants and as a direct and proximate cause of Defendants' failure to supply appropriate warnings for their Hormone Therapy Products, Plaintiff ingested these products, and Plaintiff suffered and will continue to suffer personal injury and/or death.

WHEREFORE, Plaintiff demands judgment against each Defendant, individually, jointly and severally for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT III - BREACH OF IMPLIED WARRANTY

50.     Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if the same were set forth more fully herein.

14

51.     At all relevant times herein the Defendants marketed, manufactured, promoted, distributed and/or sold Hormone Therapy Products for use by the public at large and including the Plaintiff herein. The Defendants knew the use for which their product was intended and impliedly warranted said products to be of merchantable quality, safe and fit for use.

52.     The Plaintiff reasonably relied on the skill and judgment of the Defendants, and as such, their implied warranty, in using the Hormone Therapy Products. Contrary to same, said Hormone Therapy Products were not of merchantable quality or safe or fit for their intended use, because said products are unreasonably dangerous and unfit for the ordinary purpose for which they were used.

53.     The Defendants placed Hormone Therapy products into the stream of commerce for sale and recommended its use to physicians, the FDA and consumers without adequately warning physicians, the FDA and consumers, including the Plaintiff, of the risks associated with their use.

54.     Defendants had a duty to exercise reasonable care in the research, development, design, testing, manufacture, inspection, labeling, distribution, marketing, promotion, sale and release of its Hormone Therapy Products including a duty to:

      a.     Ensure that the product did not cause the user unreasonably dangerous medical effects;

      b.     Warn of dangerous and potentially fatal side effects;

      c.     Disclose adverse material facts when making representations to physicians, the FDA and the public at large, including Plaintiff;

55.     Plaintiff's physicians prescribed and/or Plaintiff purchased and/or made the

15

decision to use Hormone Therapy Products, and reasonably relied upon the Defendants and their agents to disclose known defects, risks, dangers and side effects of these products.

56.    Plaintiff's physicians, the FDA and/or Plaintiff had no knowledge of the falsity or incompleteness of the Defendants' statements and representations concerning Hormone Therapy Products when Plaintiff purchased them as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by the Defendants.

57.    Defendants were under a duty to disclose the defective and unsafe nature of the Hormone Therapy Products to physicians, the FDA, consumers and users, such as Plaintiff. Defendants had sole access to material facts concerning the defects, and Defendants knew that physicians, the FDA and users, such as Plaintiff, could not have reasonably discovered such defects.

58.    By the conduct alleged, Defendants impliedly warranted to Plaintiff (and if applicable, Plaintiff's physicians) that the products were merchantable and fit for the purpose intended in violation of N.J.S.A. 12A:2-314 et seq. and N.J.S.A. 12A:2-315 et seq.

59.    This warranty was breached and Plaintiff was injured.

60.    As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendants, Plaintiff suffered profound injuries which are permanent and continuing in nature; required and will require medical treatment and hospitalization; has become and will become liable for medical and hospital expenses; lost and will lose financial gains; has been and will be kept from ordinary activities and duties and will continue to experience mental and physical pain and suffering, all of which damages will continue in the future.

16

WHEREFORE, Plaintiff demands judgment against each Defendant. individually. jointly and severally for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT IV - BREACH OF EXPRESS WARRANTY

61.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if the same were set forth more fully herein.

62.    The aforementioned manufacturing, designing, distributing, marketing, and promoting of the Hormone Therapy Products was expressly warranted to be safe for Plaintiff and members of the public generally. At the time of the making of the express warranties, Defendants had knowledge of the purpose for which the Hormone Therapy Products were to be used and warranted same to be in all respects safe, effective and proper for such purpose.

63.    Hormone Therapy Products do not conform to these express representations because they are not safe or effective and produce serious side effects.

64.    The Defendants placed Hormone Therapy Products into the stream of commerce for sale and recommended its use to physicians, the FDA and consumers without adequately warning physicians, the FDA and consumers, including the Plaintiff, of the risks associated with their use.

65.    Defendants had a duty to exercise reasonable care in the research, development, design, testing, manufacture, inspection, labeling, distribution, marketing, promotion, sale and release of its Hormone Therapy Products including a duty to:

   a.    Ensure that the product did not cause the user unreasonably dangerous side

17

effects;

b. Warn of dangerous and potentially fatal side effects;

c. Disclose adverse material facts when making representations to physicians, the FDA and the public at large, including Plaintiff.

66. Plaintiff's physicians prescribed and/or Plaintiff purchased and/or made the decision to use Hormone Therapy Products and reasonably relied upon the Defendants and their agents to disclose known defects, risks, dangers and side effects of these products.

67. Plaintiff's physicians, the FDA and/or Plaintiff had no knowledge of the falsity or incompleteness of the Defendants' statements and representations concerning Hormone Therapy Products when Plaintiff purchased them as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by the Defendants.

68. Defendants were under a duty to disclose the defective and unsafe nature of Hormone Therapy Products to physicians, the FDA, consumers and users, such as Plaintiff. Defendants had sole access to material facts concerning the defects, and Defendants knew that physicians, the FDA and users, such as Plaintiff, could not have reasonably discovered such defects.

69. By the conduct alleged, Defendants expressly warranted to Plaintiff (and if applicable, Plaintiff's physician that the product was merchantable and fit for the purpose intended in violation of N.J.S.A. 12A:2-313 et seq.

70. This warranty was breached and Plaintiff was injured.

71. As a direct and proximate result of the breach of said warranties of the

18

Defendants, Plaintiff suffered profound injuries which are permanent and continuing in nature; required and will require medical treatment and hospitalization; has become and will become liable for medical and hospital expenses; lost and will lose financial gains; has been and will be kept from ordinary activities and duties and will continue to experience mental and physical pain and suffering, all of which damages will continue in the future.

**WHEREFORE,** Plaintiff demands judgment against each Defendant, individually, jointly and severally for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### COUNT V - FRAUD AND MISREPRESENTATION

72. Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if the same were set forth more fully herein.

73. Defendants fraudulently, intentionally and/or negligently misrepresented the safety and effectiveness of their Hormone Therapy Products and fraudulently, intentionally and/or negligently concealed material adverse information regarding their safety and effectiveness.

74. Defendants made these misrepresentations and actively concealed adverse information at a time when the Defendants knew or should have known that the product had defects, dangers and characteristics unreasonably dangerous and that were other than what the Defendants had represented to the prescribing doctors, the FDA and the consuming public, including Plaintiff.

75. Defendants omitted, suppressed or concealed material facts concerning the

19

dangers and risks associated with the use of their Hormone Therapy Products including but not limited to the risks of breast cancer, myocardial infarction and other health problems. Furthermore, Defendants purposely ignored, downplayed, avoided and/or otherwise understated the serious nature of the risks associated with using the products in order to increase the sales of their Hormone Therapy Products.

76. Defendants falsely and deceptively misrepresented or knowingly omitted, suppressed or concealed facts of such materiality regarding the safety and efficacy of their Hormone Therapy Products from physicians, the FDA and the consuming public, including the Plaintiff.

77. The Defendants engaged in calculated silence despite their knowledge of the growing public acceptance of the misinformation and misrepresentations regarding both the safety and efficacy of the use of their Hormone Therapy Products, and did so because the prospect of huge future profits outweighed health and safety issues, all to the significant detriment of the public and the Plaintiff herein.

78. The Defendants purposefully downplayed the side effects or provided misinformation about adverse reactions and potential harms from their Hormone Therapy Products and succeeded in persuading large segments of the medical community, the FDA and consumers, including Plaintiff, despite both a lack of efficacy and the associated significant dangers of the products.

79. Defendants misrepresented the safety of the product in the labeling, advertising, promotion and marketing efforts of the product.

80. Plaintiff's physicians and/or Plaintiff relied on and was induced by the

20

Defendant's misrepresentations, omissions and/or active concealment in selecting the hormone therapy treatment for symptoms related to menopause.

81.    As a direct and proximate result of one or more of those wrongful acts or omissions of the Defendants, Plaintiff suffered profound injuries; required medical treatment and hospitalization; and Plaintiff became liable for medical and hospital expenses.

**WHEREFORE,** Plaintiff demands judgment against each Defendant individually and/or jointly for compensatory damages and punitive damages, together with interest, costs of suit and attorneys' fees and such other relief as the Court deems proper.

## COUNT VI - PUNITIVE DAMAGES UNDER COMMON LAW AND PRODUCTS LIABILITY ACT (N.J.S.A. 2A:58C-1)

82.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if the same were set forth more fully herein.

83.    The Plaintiff is entitled to punitive damages because the Defendants failure to warn was reckless and without regard for the public's safety and welfare. The Defendants misled both the medical community and the public at large, including the Plaintiff herein, by making false representations about the safety of their products. The Defendants downplayed, understated and/or disregarded their knowledge of the serious and permanent side effects associated with the use of their products despite available information demonstrating these products were likely to cause serious and even fatal side effects to the users.

84.    The Defendants were or should have been in possession of evidence demonstrating that their products caused serious side effects. Nevertheless, they continued to

21

market the products by providing false and misleading information with regard to safety and efficacy.

85.    Defendants failed to provide warnings that would have dissuaded medical providers from prescribing the Hormone Therapy Products, thus depriving medical providers and consumers from weighing the true risks against the benefits of prescribing and/or purchasing and consuming the Hormone Therapy Products.

86.    "The acts and/or omissions of Defendant as set forth *supra*, were also such knowing and willful failures to warn of adverse effects inherent in the use of its drug, that they constituted malicious, willful, wanton, and/or reckless conduct within the meaning of the New Jersey Punitive Damages Act," N.J.S.A. 2A:15-5.2 *et seq.* .

**WHEREFORE,** Plaintiff demands judgment against each Defendant individually and/or jointly for compensatory damages and punitive damages, together with interest, costs of suit and attorneys' fees and such other relief as the Court deems proper.

## COUNT VII - NEGLIGENT MISREPRESENTATION

87.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if the same were set forth more fully herein.

88.    Defendant, having undertaken the manufacturing, marketing, distribution, and/or promotion of the Hormone Therapy Products described herein, owed a duty to provide accurate and complete information regarding its products.

89.    Defendant falsely represented to Plaintiff, in direct to consumer advertising, and indirectly through misrepresentation to their prescribing physicians, that the Hormone Therapy

22

Products were safe and effective for use as prescription therapies provided to women during and after menopause. The representations by Defendant were in fact false and the drugs were not safe for said purpose and in fact dangerous to the health of Plaintiff.

90.    At the time the aforesaid representations were made, Defendant concealed from Plaintiff and her prescribing physicians information about the propensity of the drugs to cause great harm. Defendant negligently misrepresented claims regarding the safety and efficacy of said drugs despite the lack of information regarding same.

91.    The aforementioned misrepresentations were made by Defendant with the intent to induce Plaintiff to use the drugs individually and in combination with other drugs, to Plaintiff's detriment.

92.    At the time of Defendant's misrepresentations and omissions, Plaintiff was ignorant of the falsity of these statements and reasonably believed them to be true.

93.    Defendant breached its duties to Plaintiff by providing false, incomplete and/or misleading information regarding its products. Plaintiff reasonably believed Defendant's representations and reasonably relied on the accuracy of those representations when purchasing and using Hormone Therapy Products.

94.    As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff suffered profound injuries which are permanent and continuing in nature; required and will require medical treatment and hospitalization; has become and will become liable for medical and hospital expenses; lost and will lose financial gains; has been and will be kept from ordinary activities and duties and will continue to experience mental and physical pain and suffering, all of which damages will continue in the future.

23

WHEREFORE, Plaintiff demands judgement against each Defendant individually and/or jointly for compensatory damages and punitive damages, together with interest, costs of suit and attorneys' fees and such other relief as the Court deems proper.

## COUNT VIII - THE NEW JERSEY CONSUMER FRAUD ACT N.J.S.A. 56:8-1 et seq.

95.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if the same were set forth more fully herein.

96.    Defendant engaged in unconscionable commercial practices, deception, fraud, false promise, misrepresentation and/or the knowing concealment suppression or omission of material facts with the intent that others rely upon such concealment suppression or omission.

97.    As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff suffered profound injuries which required and will require medical treatment and hospitalization; has become and will become liable for medical and hospital expenses; lost and will lose financial gains; all of which damages will continue in the future.

98.    Plaintiff suffered an ascertainable loss of money or property as a result of Defendant's use or employment of unconscionable commercial practices as set forth above, and seeks treble damages, attorney's fees and costs of suit.

WHEREFORE, Plaintiff demands judgment against each Defendant individually and/or jointly for compensatory damages and punitive damages, together with interest, costs of suit and attorneys' fees and such other relief as the Court deems proper.

## COUNT IX - LOSS OF CONSORTIUM

99.    Plaintiff Spouse repeats and incorporates by reference all other paragraphs of this Complaint as if the same were set forth more fully herein.

100.    Plaintiff Spouse, was at all times relevant herein the husband of Plaintiff, and as such, lives and cohabits with her.

101.    By reason of the foregoing, Plaintiff Spouse has necessarily paid and has become liable to pay for medical aid, treatment, attendance, and for medications, and will necessarily incur further expenses of a similar nature in the future.

102.    By reason of the foregoing, Plaintiff Spouse has been caused, presently and in the future the loss of his wife's companionship, services, society, and the ability of said Plaintiff's wife in said respects has been impaired and depreciated, and the marital association between husband and wife has been altered, and as such the Plaintiff Spouse has been caused great mental anguish.

WHEREFORE, Plaintiffs demand judgment against each Defendant individually, jointly or in the alternative for compensatory damages and punitive damages together with interest, costs of suit and attorneys' fees and such other relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

(a)    General damages in a sum in excess of the jurisdictional minimum of this Court;

(b)    Medical, incidental, hospital and service expenses;

25

(c)    Compensatory damages;

(d)    Consequential damages;

(e)    Punitive and exemplary damages;

(f)    Attorneys' fees, expenses, and costs of this action;

(g)    Pre-judgment and post-judgment interest as provided by law; and

(h)    Such other and further relief as this Court may deem just and proper.

Dated: July 6, 2004

By:_____

Esther Berezofsky, Esquire
WILLIAMS, CUKER & BEREZOFSKY
210 Lake Drive East, Suite 101
Cherry Hill, New Jersey 08002
(856) 667-0500

Richard S. Lewis, Esq.
James J. Pizzirusso, Esq.
COHEN MILSTEIN HAUSFELD & TOLL, P.L.L.C.
West Tower, Suite 500
1100 New York Avenue., N.W.
Washington, DC 20005-3964

Michael Williams, Esq.
Leslie O'Leary, Esq.
WILLIAMS DAILEY O'LEARY CRAINE & LOVE,
P.C.
101 SW 5th Ave., Suite 1900
Portland, OR 97204-1135

James Morris, Esq.
PROVOST & UMPHREY LAW FIRM, L.L.P.
490 Park Street
P.O. Box 4905
Beaumont, TX 77704

Attorneys for Plaintiffs

26

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a jury trial on all claims triable in this action.

Attorneys for Plaintiffs

By:_____

Esther Berezofsky, Esquire
WILLIAMS, CUKER & BEREZOFSKY
210 Lake Drive East, Suite 101
Cherry Hill, New Jersey 08002
(856) 667-0500
Attorneys for Plaintiffs

Dated: July 6, 2004

## CERTIFICATION PURSUANT TO RULE 4:5-1

Pursuant to Rule 4:5-1, upon information and belief the undersigned certifies that the matter

in controversy is not the subject of any other action pending in any other court or of a pending

arbitration proceeding nor is any other action or arbitration contemplated.

Attorneys for Plaintiffs

By:_____

Esther Berezofsky, Esquire
WILLIAMS, CUKER & BEREZOFSKY
210 Lake Drive East, Suite 101
Cherry Hill, New Jersey 08002
(856) 667-0500
Attorneys for Plaintiff

Dated: July 6, 2004

**WILLIAMS CUKER BEREZOFSKY**
Woodland Falls Corporate Park
210 Lake Drive East, Suite 101
Cherry Hill, NJ  08002
856-667-0500
*Attorneys for Plaintiffs*

AUG 2 4 2005

| | | |
|---|---|---|
| GRACIANA MANALO and FELIPE MANALO, | : | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ATLANTIC COUNTY |
| | : | |
| Plaintiffs, | : | DOCKET NO. ATL-2102-04 MT |
| | : | |
| v. | : | Case No. 266 |
| | : | |
| WYETH, INC., et al, | : | Civil Action |
| | : | |
| Defendants. | : | **VOLUNTARY DISMISSAL WITHOUT PREJUDICE** |
| | : | |

The matter in difference in the above-entitled action having been amicably adjusted by and between the plaintiffs, Graziana Manalo and Felipe Manalo, and the defendants, Wyeth, Inc. and Wyeth Pharmaceuticals, Inc., it is hereby stipulated and agreed by and between these respective parties that this New Jersey action, including all claims asserted herein, be and is hereby dismissed without prejudice as against Wyeth, Inc. and Wyeth Pharmaceuticals, Inc., without costs in favor of or against any party to permit plaintiffs to continue to pursue their claims in the Pennsylvania State Court under the caption *Graciana Manalo and Felipe Manalo v. Wyeth, Inc., et al,* No. 004503.

WILLIAMS CUKER BEREZOFSKY
Attorneys for Plaintiffs

By:_____
      Esther E. Berezofsky, Esquire

Dated: 6-28-05

PORZIO BROMBERG & NEWMAN, P.C.
Attorneys for Defendants Wyeth, Inc. and
Wyeth Pharmaceuticals

By:_____
      Tara E. Nicola, Esquire

Dated: 8/22/05

**EXHIBIT C**

THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
IN THE COURT OF COMMON PLEAS

| | | |
|---|---|---|
| ELIZABETH and JOE COLEMAN, | : | TRIAL DIVISION - CIVIL |
| | : | |
| Plaintiffs | : | JUNE TERM, 2004 |
| | : | NO. 3179 |
| VS. | : | |
| | : | |
| WYETH PHARMACEUTICALS INC., et al. | : | |
| | : | CONTROL No. 020384 |
| Defendants | : | |

DOCKETED

SEP 2 4 2007

S. LONERGAN

### FINDINGS AND ORDER

This matter comes before the Court by way of Defendant Wyeth's Motion for Summary Judgment[1] dated February 20, 2007 at Control #020384. The Court heard oral argument on this Motion on June 14, 2007 and the matter was taken under advisement. The Court now enters the following Findings and Order.

Plaintiff, Elizabeth Coleman ("Coleman") is a 67-year-old woman from Arkansas. She took one or more types of hormone replacement therapy ("HRT") medications continuously between November 1991 and October 2000, to treat vasomotor symptoms (hot flashes and irritability) related to menopause. (Short Form Complaint, ¶¶ 1, 3; Dep. of Elizabeth Coleman, 15:14-15). During these nine years, she took Premarin and Provera from November 1991 to November 1998; Prempro from November 1998 to April 2000; and Premarin again from April 2000 to October 2000. (Short Form

---

[1] This motion was joined by Defendant Pharmacia & Upjohn on February 21, 2007.

1

**EXHIBIT D**

Complaint, ¶ 3.) Premarin and Prempro are products of Defendant Wyeth, Inc.[2] Provera is a product of Pharmacia & Upjohn, a successor company to the Upjohn Company.

Coleman was diagnosed with breast cancer on October 20, 2000, at which time she discontinued all HRT. As a treatment for the breast cancer, she chose to have surgery. Her surgeon wanted to do a lumpectomy. Plaintiff requested a mastectomy. (*Id* at 80:30-25, 81:1-4, 154:1-16, 156:4).

Coleman filed her action against the Wyeth[3] defendants, Pfizer, Inc.[4] and Pharmacia & Upjohn, Inc., on June 28, 2004. Coleman's husband also brings an action for loss of consortium. (Short Form Complaint, ¶ 7).

Coleman first sought out treatment for her menopausal symptoms from Dr. Haynes Jackson, Jr., in November of 1991. She had first been a patient of Dr. Haynes Jackson, Sr., for twenty (20) years prior to this time.[5] (Dep. of Elizabeth Coleman at 12-13). Although Coleman does not recall the conversation with Dr. Jackson, she does not dispute the accuracy of Dr. Jackson's record of that meeting which says, "Wants to discuss estrogen replacement. Complains of hot flashes." (*Id.* at 13-14).

---

[2] Premarin is dispensed as tablets of 0.625 milligrams of conjugated estrogens plus inactive ingredients, such as colorants and binders. (1999 Physician's Desk Reference). The conjugated estrogens "are a mixture of sodium estrone sulfate and sodium equilin sulfate" and other chemical components. (Id.). Prempro is dispensed as "a single tablet containing 0.625 milligrams of the conjugated estrogens found in Premarin tablets and 2.5 or 5 milligrams of medroxyprogesterone acetate," (depending on the dosage) plus inactive ingredients. (Id.). "Medroxyprogesterone acetate is a derivative of progesterone." (Id.). Prempro's formulation provides for the release of estrogens "over several hours," as distinguished from formulations that are immediately "absorbed from the gastrointestinal tract." (Id.). Coleman's 1998 Prempro prescription was the "0.625/2.5" formulation. (See Defendant Wyeth's Motion for Summary Judgment Based on the Statute of Limitations, Exh. B).

[3] Plaintiff's complaint named as defendants, Wyeth Pharmaceuticals, Inc., Wyeth-Ayerst Pharmaceuticals, Inc., Wyeth Ayerst International, Inc., Wyeth Laboratories, Inc., Wyeth Pharmaceuticals and Wyeth, Inc. Hereinafter to be called "Wyeth".

[4] Defendant Pfizer was dismissed by agreement of the parties with approval of this Court on December 11, 2006.

[5] Any future reference to Dr. Jackson will be to Dr. Haynes Jackson, Jr., unless specifically noted.

Coleman did not recall any discussion with Dr. Jackson regarding the risk and benefits of hormone therapy for estrogen replacement. (*Id.* at 14-18). Dr. Jackson testified that at the time he was treating Coleman, he would typically mention to his HRT patients that the possible increased risk of breast cancer "was an unsettled issue," but that nonetheless it was a risk that he "included in [his] discussion because [t]he issue of whether or not hormone therapy was related to breast cancer was commonly discussed and was a common question from patients." (Dep. of Haynes Jackson, Jr., 32:20-25, 331-20). Dr. Jackson typically "told [patients] that there was conflicting information in different studies as to whether there was increased risk versus some protection, and that it was an ongoing actively-studied issue without a conclusion at that time." (*Id.*, at 66:4-8).

Coleman then began to visit with David Greathouse, M.D., as her gynecologist beginning in November 1998. (Dep. of David Greathouse, 40:11). She took Prempro prescribed by Dr. Greathouse from March 1999 through April 2000, when she had a hysterectomy. (*See Id.*, at 52:5-9). From that time forward, Coleman used estrogen-only Premarin. (*See Id.*, at 52:14-19). When discussing HRT with his patients, Dr. Greathouse "would have . . . discussed the possibility of DVT [deep-vein thrombosis], stroke, and perhaps even made mention of there being a possible concern of breast cancer." (*Id.*, at 40:22-25). "The risk of taking hormone, as I tell all of my patients, is that you possibly will develop a blood clot, you possibly will have a stroke, you possibly could develop breast cancer." (*Id.*, at 57:14-17).

Coleman's mail-order HRT prescription packages "always" included "a fact sheet" insert, which she would generally read, "[looking] for the side effects" of the drugs. (Dep. of Elizabeth Coleman, 18:15, 19, 22:10). The insert she received with her

3

Prempro prescription included a warning that "a possible increase in breast cancer risk" was "[an] additional risk [that] may be associated" with using that drug and directed the reader to read a paragraph entitled "*Cancer of the Breast.*" (Patient Package Insert for Prempro. November 23, 1999) (emphasis in original). This paragraph warned that some studies had shown an increased breast cancer risk in women who used estrogen-only HRT; that some studies had shown no increased risk with estrogen-only HRT; and that "[t]he effects of added progestin on the risk of breast cancer are unknown." (*Id.*). Prempro is a combination estrogen and progestin HRT product. (*Id.*).

Studies indicating a possible elevated risk of breast cancer in long-term users of estrogen have been published "as early as 1961, when French animal studies linked exogenous [i.e., not naturally produced by the subject animal itself] hormones to mammary tumors." (*See* Plaintiff's Expert Report of Christina Clarke, Ph.D., MPH, at 8) (hereafter "Clarke").

One American example is the 1976 Hoover study, published in the *New England Journal of Medicine*. (*See* Plaintiff's Expert Report of Cheryl D. Blume, Ph.D., at 21, 39) (hereafter "Blume"). This study reported an increased "relative risk of breast cancer in patients taking conjugated estrogens" and that "the risk of breast cancer for women diagnosed after they started taking estrogen was 7 times greater than that of the general population." (*Id.* at 21-22). The 1989 Bergkvist study, also published in the *New England Journal of Medicine*, "directly link[ed] EPHT (combined estrogen-progestin HRT) use to breast cancer in Swedish women." (Clarke at 9; *see also* Blume at 41). The Bergkvist results "suggested that Swedish women taking EPHT for at least six years had [a]

4

strongly elevated risk (440%) of breast cancer than [sic] women who never took hormones." (Clarke at 9).

"A significant increase in the incidence of breast cancer in postmenopausal women taking estrogen was noted in a November 1990 JAMA [*Journal of the American Medical Association*] publication." (Blume at 24). This article reported "a prospective study on the risk of breast cancer in postmenopausal women taking estrogen replacement therapy" and "reported an elevated risk . . . among current users." (Blume at 41). A 1991 study published in JAMA "estimated that every year in the United States, [HRT] use could add about 4700 preventable cases of breast cancer." (Blume at 42). In January, 2000, JAMA published "Menopausal Estrogen and Estrogen-Progestin Replacement Therapy and Breast cancer Risk" by Dr. Schairer. (*See* Plaintiff's Expert Report of Dr. John Gueriguian, at 54) (hereafter "Gueriguian"). The article stated, "[T]he estrogen-progestin regimen increases breast cancer risk beyond that associated with estrogen alone." (*Id.*) The following month, the Journal of the National Cancer Institute published similar findings, by Dr. Ross, of "strong evidence that the addition of a progestin to HRT markedly enhances the risk of breast cancer relative to estrogen use alone. These findings have important implications for the risk-benefit equation for HRT in women using CHRT (combined HRT)." (*Id.*).

Articles about a possible causal link between HRT and breast cancer began to appear in the popular press by 1997. An article in *Good Housekeeping* discussed "risk-free alternatives to hormones" in February 1997, with a book excerpt that asserted, "We *do* know that [HRT] increases a woman's risk of developing breast cancer." (Wyeth's Supplemental Reply in Further Support of Summary Judgment, Exh. A-1) (emphasis in

original). National publications such as USA Today, Newsweek, and the New York Times released between 1997 and 2000, included similar articles warning of increased breast cancer risk associated with HRT. (*See Id.*, Exhs. A-1 - A-9). Locally to Coleman, the *Arkansas Democrat-Gazette* published at least two articles between 1998 and 2000 addressing HRT and an elevated risk of breast cancer. (*See Id.*, Exhs. A-10, A-11). The 1998 headline: "Drug could prove alternative to estrogen without the risk," assumed a proven causal relationship (*Id.*, Exh. A-10). The 2000 headline stated plainly, "Study: Hormone combo raises breast cancer risk." (*Id.*, Exh. A-11).

Similarly, reports regarding the long-term use of HRT and the occurrence of breast cancer surfaced in mainstream national news broadcasts and other news programs beginning in 1995, including evening network news shows and CNN. (*See Id.*, 5-7). As demonstrated in the examples above, much of the language used in the mainstream press reports, including reports prior to 2002, presumes a proven causal link between the use of HRT and an elevated risk of cancer.

The Women's Health Initiative (WHI) is "a randomized, controlled trial of the benefits and risks of hormone replacement therapy." *See* Victoria Hendrick, M.D., *Hormones as Treatment for Perimenopausal and Postmenopausal Depression*, Geriatric Times 35 (January 1, 2004). "The study's duration had originally been planned for 8.5 years, but in 2002 the study's estrogen (Premarin) plus medroxyprogesterone acetate (Provera) arm was abruptly discontinued after 5.2 years because preliminary findings showed that this hormone combination appeared to increase rather than decrease the risk of coronary heart disease. In addition, this hormone combination was associated with an elevated risk of invasive breast cancer compared to placebo." *Id.; See also* J. E. Rossouw,

6

et. al. *Risks and Benefits of Estrogen Plus Progestin in Healthy Postmenopausal Women*, 288 JAMA 321 (July 17, 2002).

> Prior to the WHI report, Coleman's OB/GYN, Dr. Greathouse, was
>
> "[V]ery aware of the potential increased risk of breast cancer with hormones. And so because that information was still there, even though I met Ms. Coleman prior to Women's Health Initiative, certainly I would have discussed with her there's a possibility of this risk in hormone users. Is it Premarin alone, is it Prempro, it's hormone users."

(Dep. of David Greathouse, 111:19-25, 112:1).

Use of HRT is contraindicated after a diagnosis of breast or uterine cancer. *See* Physician's Desk Reference 1999. In October 2000, when Coleman's breast cancer was diagnosed, her treating physician, Dr. Greathouse, told her to quit taking all HRT. (Dep. of Elizabeth Coleman, 43-44). Dr. Smith, Coleman's surgeon, concurred. (*Id.* at 43). Coleman has discontinued use of HRT since her breast cancer diagnosis; she currently treats with Dr. Webb and has been taking Tamoxifen[6] as a follow-up treatment to her breast cancer. (*Id.* at 78:23-79:10).

Defendants have filed a Motion for Summary Judgment arguing that the statute of limitations began to run on Coleman's claim on October 20, 2000, the date she was diagnosed with breast cancer. Thus, this action, filed on June 28, 2004, almost four years after her diagnosis, is untimely and barred by Pennsylvania's two year statute of limitations applicable to her claim. *See 42 Pa.C.S. § 5524(2)*.

Coleman argues in response that she did not and could not know the facts concerning the cause of her cancer prior to July 9, 2002, when a public announcement was made that the WHI study "had been prematurely terminated based on preliminary

---

[6] Tamoxifen is used to prevent the growth of cancer cells by interfering with the activity of estrogen. *See* National Cancer Institute Fact Sheet. http://www.cancer.gov/cancertopics/factsheet/Therapy/tamoxifen.

findings which revealed a significant increase in the risk of breast cancer in combination hormone therapy users." *See* Plaintiff's Brief in Opposition to Summary Judgment, p.3. Coleman further argues that even if she had reason to suspect that HRT may have caused her breast cancer, a "diligent investigation of the cause of her breast cancer would <u>not</u> have led Mrs. Coleman to reasonably conclude that hormone therapy was the cause of her breast cancer." *Id.* at p. 4 (emphasis in original). Coleman argues that the application of the discovery rule operates to toll the statute of limitations and thus her action was timely filed.

"After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law." *Pa.R.C.P. 1035.2.* "In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Fine v. Checcio,* 582 Pa. 253, 870 A.2d 850, 857 (2005).

The statute of limitations to institute an action to recover damages for personal injury is two years. *See 42 Pa.C.S. § 5524(2).* The statute of limitations begins to run on an injury when a person knows or reasonably should know that he has been injured and by what cause. *See Fine v. Checcio,* 582 Pa. 253, 870 A.2d 850, 858 (Pa. 2005). It is a "well established principle that where the facts are so clear that reasonable minds cannot differ, the commencement period may be determined as a matter of law." *Cochran v. GAF Corp.,* 542 Pa. 210, 666 A.2d 245, 248 (1995). "Mistake, misunderstanding, or lack of knowledge in themselves do not toll the running of the statute." *Fine,* 870 A.2d at

8

857. "Once a cause of action has accrued and the prescribed statutory period has run, an injured party is barred from bringing his cause of action." *Id.* at 857. Notwithstanding this principal, there are certain exceptions which toll the running of the statute of limitations. *Id.* at 858. The discovery rule is the exception at issue in the immediate case.

"The discovery rule is applicable in situations where the injury or its cause was either unknown or not reasonably ascertainable to the injured party for a certain period of time." *Id.* "The purpose of the discovery rule has been to exclude from the running of the statute of limitations that period of time during which a party who has not suffered an immediately ascertainable injury or is reasonably unaware that he has been injured, so that he has essentially the same rights as those who have suffered such an injury." *Id.* (citing, *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992)). "[O]ne claiming the benefit of the exception bears the burden of establishing that she falls within it." *Cochran*, 666 A.2d at 249.

"The salient point giving rise to the equitable application of the exception of the discovery rule is the inability, despite the exercise of diligence by the plaintiff, to know of the injury." *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983) (emphasis supplied). "Reasonable diligence is just that, a reasonable effort to discover the cause of an injury under the facts and circumstance present in the case." *Cochran*, 666 A.2d at 249. "Reasonable diligence is an objective, rather than a subjective standard." *Id.* However, "plaintiff is not under an absolute duty to discover the cause of his illness. . . [but] must exercise only the level of diligence that a reasonable [person] would employ under the facts and circumstances presented in a particular case." *Id.*

9

We find based on the record that Coleman failed to exercise the level of diligence that a reasonable person would employ under the facts of her case and therefore, has failed to establish that that she falls within the exception of the discovery rule.

Coleman was diagnosed with breast cancer on October 20, 2000. Coleman filed suit on June 28, 2004. Coleman claims that she could not have known that the hormone replacement therapy that she received was responsible for her breast cancer until the publication of the results of the Women's Health Initiative Study in July 2002.

> It is Mrs. Coleman's unwavering testimony that at no time prior to July 9, 2002 was she warned by any of her doctors, friends, family, or the media that hormone replacement therapy was associated with breast cancer. Why? The reason is simple. There was no definitive association between hormone replacement therapy and breast cancer until the abrupt termination of the WHI Study on July 9, 2002.

*See* Plaintiff's Brief in Opposition to Summary Judgment, p. 6 (emphasis supplied).

First, Coleman's assertion that she was never told that there may be a connection between HRT and breast cancer is not supported by the record. When Coleman was diagnosed with breast cancer in October 2000, she admits to having a conversation with her treating doctor in which the relationship between her breast cancer and her hormone therapy was discussed.

> Q.  Have any of your doctors told you that they think your breast cancer was caused by taking hormone therapy?
> A.  Not in so many words, no.
> Q.  Have they told you in any way?
> A.  Well, I was told it was estrogen positive.
> Q.  Do you interpret that to mean -- by somebody telling you "estrogen positive" do you interpret that to mean that they think your breast cancer is caused by hormones?
> A.  I don't know.

10

Q.    Well, when I asked the first question, "Has your doctor told you that your breast cancer is caused by hormone therapy," and you said, "Not in so many words" right?  Is that right?

A.    Is that what I said?

Q.    And then, my next question was, "Well, in what words are you thinking they told you that?"  And you said, "They told me it was estrogen receptor positive"; right?

A.    And it is -- it was.

Q.    Absolutely, that's what the records say about it?

A.    That's right.

Q.    It is estrogen receptor positive.  Did you think that meant that your breast cancer was caused by hormone therapy?

A.    Yes, I guess, Yes.

Dep. of E. Coleman at 127-128.

Assuming arguendo, that the above conversation at the time Coleman was advised of her injury was not a *per se* notice to her of the nexus between her cancer and HRT, then given her level of understanding (as evidenced by the above testimony), notice of her injury was more than sufficient to trigger her <u>duty</u> <u>to</u> <u>investigate</u> a possible link between HRT and her breast cancer.

Coleman argues that the *sine qua non* for triggering the running of the statute of limitations in Pennsylvania is a requirement that Plaintiff know of a definitive association between her injury and the hormone therapy she received.[7]

This has never been the law in Pennsylvania.

In *Ayers v. Morgan*, 397 Pa. 282, 154 A.2d 788 (1959) our Supreme Court established that it was the discovery of the injury that began the running of the statute of limitations in tort claims.  The Court emphasized that "[t]he statute. . . . says that the suit

---

[7] This Court will not now address the subsidiary issue of if, when and how the Plaintiff became aware of the WHI Study.

11

must be brought within two years from the time when the injury was done." *Id.* at 792 (emphasis supplied). "The injury is done when the act heralding a possible tort inflicts a damage which is physically objective and ascertainable." *Id.*

Here, there is no dispute that damage was ascertainable when Coleman was diagnosed with breast cancer. Therefore, Coleman's statute of limitations began to run on that date.

Once the injury has been determined, what duty is imposed upon Plaintiff by the statute of limitations? One duty is obvious: bring the action within two (2) years. If this is not accomplished, can the time period be extended? Yes, but only if within the exercise of due diligence, the Plaintiff could not have discovered that the conduct of another was the possible cause of the injury. *See DeMartino v. Albert Einstein Medical Ctr. N.D.*, 313 Pa. Super. 492, 460 A.2d 295 (1983).

In *Groover v. Riddle Memorial Hospital*, 357 Pa. Super. 420, 516 A.2d 53 (1986), our Superior Court rejected one aspect of Coleman's argument here: that she could not have known of a definitive association between her breast cancer and HRT because her doctors did not know that there was a definitive connection between the two.

As part of Plaintiff's Response to this Motion, she presented the following testimony of her treating doctor, Dr. Haynes Jackson, Jr.

> Q. And the note here states that: "Wants to discuss estrogen replacement. Complaining of hot flashes." Do you see that there?
> A. Yes.
> Q. Do you have an independent recollection of this appointment with Mrs. Coleman? Or is it, you're basing your recollection on what's in the chart?
> A. I'm basing my own -- of what's in the chart.
> Q. At that time period in 1991, when you first prescribed a woman hormone therapy, did you have any

12

discussion with her at the time of that as to the potential risks and/or benefits of hormone therapy?

A.    Yes.

Q.    Could you tell me what the content of that discussion that you typically had in that time period was?

A.    Typically, I would tell a patient that we were treating symptoms with this hormone therapy. In her case, basal motor symptoms that, in as much as we knew at the time, there might be some risk with hormone therapy and there might be some benefits that had as yet been uncovered. The issue of whether or not hormone therapy was related to breast cancer was commonly discussed and was a common question from patients. And at that time, the information I had to share with a patient was simply that it was an unresolved issue in dispute. There were some studies to suggest possible breast protection and some studies to suggest increased risk, and it was an unsettled issue.

Q.    So it was your practice in that time period, when discussing hormone replacement therapy with a woman about to start it, to discuss with her that there was an unresolved issue as to whether or not there could be an association with hormone therapy and increased risk of breast cancer?

A.    Yes.

Q.    And that was something that you included in your discussion?

A.    Yes.

Dep. of Haynes Jackson, Jr., M.D., 11/18/05, pp.32-33.

Q.    Now, can we agree that at least as far as your notes are concerned, that we've gone through here today -- and I don't want to go back through all of them unless we need to -- but can we agree that there is no mention in your progress notes of a specific consultation where you mentioned to Mrs. Coleman the issue of breast cancer?

A.    I don't see it in writing.

Q.    All right. And in that time frame back in 1991, I think we've established in your direct examination that it was your routine practice to speak to women concerning that issue of breast cancer. As I understand your testimony and appreciate your testimony, your position, at least in 1991, was it was a matter that was still in dispute and no definitive advice could be given regarding that; is that correct?

A.    That's correct.

13

Q.    Sitting here today, do you remember having a specific conversation with Mrs. Coleman on that issue?

A.    I don't recall a specific conversation.

Q.    Through the seven years that you treated her up until 1998, do you recall your opinion changing in terms of whether or not there was a relationship that had been definitively established?

A.    A relationship?

Q.    Between the hormone therapy and the breast cancer. I'm sorry.

A.    No.

Q.    All right. So as of the time that you ceased treating her in 1998, was it your opinion that that issue, whether or not breast cancer was related to hormone therapy, was still a matter in dispute?

A.    That's correct.

Dep. of Haynes Jackson, Jr., M.D., 11/18/05, pp. 57-58.

It is evident from Dr. Jackson's testimony that those in the medical profession were aware that HRT increased the risk of breast cancer. Despite the lack of consensus regarding whether HRT definitively causes breast cancer, most doctors, including Dr. Jackson, were aware of the studies suggesting an increased risk of breast cancer and routinely discussed that information with their patients.

The *Groover* Court had before it a case in which the plaintiff claimed she consulted with numerous doctors who could not tell what was causing her pain and thus she was entitled to have the statute of limitations tolled until she could discover the cause of her pain:

> Appellant maintains that the discovery rule delayed the running of the statute. She argues that from the time she received the painful injection in the spring of 1979 until June of 1983, she continuously sought help concerning the pain in her right leg, and that she attempted to determine the type of injury she suffered and the cause of that injury. She contends that she saw numerous doctors who did not know what was wrong with her leg.

14

*Groover*, 516 A.2d at 57

The Court rejected plaintiff's argument and responded to plaintiff's claim by holding that:

> Appellant need not have known the precise medical cause of the injury in order to commence the running of the statute of limitations. She need only to have known that she was *injured*. "An injury is done when the act heralding a possible tort inflicts a damage which is physically objective and ascertainable." *Ayers v. Morgan*, 397 Pa. 282, 290, 154 A.2d 788, 792 (1959).

*Id.* at 57.

Here, as in *Groover*, Coleman "alleges that the physicians with whom she consulted told her that they did not know what the problem was." *Id.* at 57. If we read Coleman's "allegations in a common sense fashion, we believe that [she] knew or reasonably should have known . . . . the cause of her problem." *Id.* at 57. Any "statements by [Coleman's] physician[s] should not be read to mean that they did not know, or suspect [what] caused the injury." *Id.* at 57. "Rather, common sense suggests that the statements should be read to mean that the physicians were not medically certain as to the precise medical reason that . . . triggered the problem . . ." *Id.* at 57.

The *Groover* court rejected the same argument made by Plaintiff herein: to wit—that all of the doctors she saw did not know the cause of her injury. The *Groover* court opined:

> In her counter-affidavit to appellee's motion for summary judgment, appellant alleged that all of the doctors she saw did not know the cause of her injury until one doctor, in December of 1982, began to suspect that the cause may be related to the injections. This does not alter our

15

holding. From the facts related, *supra*, at the very least, appellant reasonably should have known that her problems were caused by the injection. One need only know (or reasonably should know) that he is injured and that the injury was caused by the conduct of another. . . . . . . [I]it is only essential that the injured party know or reasonably should know that the conduct of another has caused the injury.

*Id.* at 57-58 (internal citations omitted) (emphasis in the original).

The *Groover* court then reviewed the operative duty of a plaintiff in these cases:

Thus, once the patient is aware or should reasonably have become aware that medical treatment is causing him personal injury the statute begins and the prospective plaintiff is required to begin doing those things for which the statute of limitations specifically provides time: "an opportunity to select and consult with a lawyer, investigation, initiation of suit, discovery, joinder of additional parties, etc." *Keating v. Zemel*, 281 Pa. Superior Ct. 129, 134 n.4, 421 A.2d 1181, 1184 n.4 (1980). It is during this two year period that the medical malpractice plaintiff, like any other plaintiff pursuing any other legal claim, makes the decision whether or not to pursue any legal rights he may possess.

*Id.* at 58 (citing *DeMartino* 460 A.2d at 300).

In the instant case, Coleman maintains that at the time of her diagnosis and surgery she was not told anything by her doctors that would lead her to believe that HRT caused her breast cancer. *See* Plaintiff's Response at p. 3. However, there is no doubt that Coleman <u>knew</u> of her injury as she was diagnosed with breast cancer on October 20, 2000. As the *Groover* court makes clear, Plaintiff need not know the exact medical cause of her injury to start the running of the statute of limitations. Rather, it's the knowledge that Plaintiff has been <u>injured</u> that triggers the statute of limitations and imposes on her a duty to investigate her claim. *See also, Connors v. Upjohn Co.*, 1989 Pa. Super. LEXIS 4096, *8 ("The exact cause of injury is not a controlling factor in tolling the Statute of

16

Limitations. Rather, the statute begins to run when a plaintiff claimant knows or reasonably should have known of the injury and that a third person caused it").

Nonetheless, it is clear from the record that at the time of her injury, both Coleman (and her doctors) had sufficient information about the increased risk of breast cancer associated with HRT to "begin doing those things for which the statute of limitations specifically provides time," such as investigating the basis for her claim. *Groover*, at 58.    Coleman asserts that there was no way for her to have known nor should she have known, that HRT was responsible for her injury until the publication of the WHI. However, "[t]he polestar of the Pennsylvania discovery rule is not a plaintiff's actual acquisition of knowledge but whether the information, through the exercise of due diligence, was knowable to the plaintiff." *Bradley v. Ragheb*, 429 Pa. Super. 616, 633 A.2d 192, 196 (1993).

We find that despite Coleman's assertions, there was available sufficient information at the time she was diagnosed with breast cancer, such that she was under a duty to diligently investigate its cause.

Coleman contends that the dissemination of the WHI study was an event that changed the way medical professionals and citizens alike thought about HRT and breast cancer. *See* Plaintiff's Response to Summary Judgment at p. 3. However, this contention can be disproved by Plaintiff's own witness, Dr. David Greathouse, who previously testified at his deposition to the complete contrary:

> Q: Do you agree that after the Women's Health Initiative report was issued in July of 2002 that OB/GYNs like yourself certainly became more focused on the issue as to whether or not the hormone therapy causes breast cancer?
>
> A: I don't agree with that. And the reason I don't is the Women's Health Initiative study did not bring new evidence to light, in my opinion.

17

Dep. of David Greathouse, pp.110:23-111:5.

By many accounts, the results of WHI showed a much lower rate in the risk of breast cancer for women on HRT than had been reported in previous studies. In fact, many of the early studies showed a relative risk of 2.0 or higher for women who took HRT (as did the package insert supplied by Wyeth during the time Coleman took the drug), while data from the WHI reported a relative risk of only 1.24 compared to placebo. *See* Clarke at 4.

In *Meehan v. Archdiocese of Phila.*, 2005 Pa. Super. 91, 870 A.2d 912 (2005), plaintiffs, victims of sexual abuse by priests, claimed that "the coverage of the Catholic Church abuse scandal constituted new harm that should . . . . toll the statute of limitations." *Id.* at 919. The court found however, that plaintiffs "knew they were injured by their abusers at the time of the abuse" which had occurred between twenty-one and forty-seven years earlier and rejected plaintiffs' argument "that they did not know that the Church was a possible cause of their injury until 2002." *Id.* at 920, *see also, Baselice v. Franciscan Friars Assumption BVM Province*, 2005 Pa. Super. 246, 879 A.2d 270 (2005). In holding that "that the discovery rule is inapplicable" the court opined:

> "Neither the plaintiffs' lack of knowledge of the Archdiocese's conduct, nor the plaintiffs' reluctance, as members of the Catholic Church, to investigate the possible negligence of the Archdiocese of Philadelphia after having been abused by one of its priests or nuns, tolls the statute of limitations when the plaintiffs had the means of discovery but neglected to use them."

*Id.* at 921.

The argument made by the plaintiffs in *Meehan* is strikingly similar to the argument presented by the Plaintiff herein. As in *Meehan*, Plaintiff claims that the

18

international release of the WHI study in 2002 was the event that put her on notice of a possible connection between her breast cancer and her HRT ingestion and thus started the running of the statute of limitations in the instant case. However, as in *Meehan*, Plaintiff knew of her injury almost two years prior to the release of WHI and had she chosen to investigate the cause of her cancer, would have found ample information linking it to HRT.

Based on the entire record before this Court, we find that there was sufficient evidence available to the public on October 20, 2000, regarding the connection between HRT and breast cancer to put Coleman on notice of a possible cause of her injury. As thoroughly discussed in the facts above, numerous widely publicized clinical studies, as well as articles in the mainstream press, regarding the increased risk of breast cancer in women who took HRT were published years before the WHI. Coleman's contention that a diligent investigation would have been fruitless is unfounded and factually incorrect. Coleman's testimony clearly shows that she was aware of the possible connection between HRT and breast cancer prior to the WHI. Coleman admitted that she received HRT prescriptions monthly and it "always" came with a "fact sheet insert" which she read "looking for the side effects." (Dep. of Elizabeth Coleman, 18:15, 19, 22:10). Refuting her claim that the information she needed was unavailable to her, Coleman testified as follows:

> Q: Prior to 2000, did you make it a practice to read any information that was provided by the manufacturer of a medicine before you took it, or not?
>
> A: I always scanned it and looked for the side effects, but not- after you have been taking it a while, you don't read it every time, but it is there.

Dep. of Elizabeth Coleman, 22:5-11

Additionally, the testimony of Plaintiff's own experts refutes her claim that a diligent investigation would not have revealed a causal relationship between HRT and breast cancer. Plaintiff's expert, Christina Clarke Ph.D, MPH, an epidemiologist and research scientist, testified that a possible elevated risk of breast cancer was known "as early as 1961, when French animal studies linked exogenous hormones to mammary tumors." *See* Clarke at p. 8, ¶10.

Another of Plaintiff's experts, Cheryl D. Blume, Ph.D., retained most likely because of her many years supervising and evaluating the scientific and regulatory aspects of the pharmaceutical industry, testified that the 1976 Hoover Study reported that "the risk of breast cancer for women diagnosed after they started taking estrogen was 7 times greater than that of the general population." *See* Blume at 22, 39.

The above-mentioned are merely two of many studies preceding Coleman's injury, and were known by her experts prior to the release of WHI. As evidenced by the exhibits in Defendants' Supplemental Reply, an untold number of articles in the popular press alerted the general public to the association between HRT and breast cancer. *See* Wyeth's Supplemental Reply in Further Support of Summary Judgment, 5/25/07. Yet Plaintiff now disingenuously claims that there was no viable information available to learn of the correlation between HRT and breast cancer in October 2000, when she was diagnosed. Public availability of these publications prior to WHI, however, refutes Plaintiff's claim that a reasonable effort to discover the cause of her cancer would have been fruitless.

This Court finds it significant that Plaintiff failed to inquire about the cause of her breast cancer even after being instructed to stop taking HRT. Coleman testified that after

being diagnosed, her surgeon, Dr. Smith, instructed her to stop taking HRT. She then consulted with Dr. Greathouse who concurred with those instructions due to fear of "promoting or spreading the cancer" (Dep. of David Greathouse 145:5-9).

In *De Martino, supra,* a medical malpractice case, the court found that the plaintiff's injury (pain in his tooth after surgery) was not enough to trigger the plaintiff's knowledge of its cause. *See* 460 A.2d at 303. The court found, however, that once another doctor told him that whoever performed the surgery "must not have been watching what he was doing" plaintiff was "then cognitive of the operative cause and the relationship between the cause and the injury." *Id.* The court recognized that although the other doctor "could not be positive of what had occurred, [plaintiff] was no longer oblivious to the possibility that there may be more to his persistent problems than a natural progression of his disease." *Id.* The court held that "[plaintiff] had sufficient empirical information at his disposal to begin an investigation into suspicions which should reasonably have arisen out of [the doctor's] observations" and thus trigger the statute of limitations. *Id.* at 303-04. The court further found that "the alleged failure of other physicians to inform [plaintiff] of the cause of his dental problems [was] irrelevant to the start of the statute." *Id.* at 305.

Here, as in *DeMartino,* Plaintiff was told by both Dr. Smith and Dr. Greathouse to cease taking HRT after she was diagnosed with breast cancer. Dr. Greathouse was especially concerned about "promoting or spreading the cancer." (Dep. of David Greathouse 145:5-9). Yet, despite these instructions, Plaintiff still failed to inquire of her doctors whether HRT caused her cancer. This Court finds, however, that the instructions of Coleman's doctors to discontinue the HRT after her diagnosis put her on notice of a

21

link between the drug and her cancer. As in *DeMartino*, although Coleman's doctors "could not be positive of what had occurred," they provided her with enough information to realize "that there may be more to [her] . . . . problems than a natural progression of [her] disease." *Id.* at 303. Thus, Plaintiff's selective ignorance regarding the cause of her disease fails to toll the statute of limitations.

"Failure to make inquiry when information is available is failure to exercise reasonable diligence as a matter of law." *Bradley v. Ragheb*, 429 Pa. Super. 616, 633 A.2d 192, 196 (1993). In *Cochran v. GAF Corp., supra*, plaintiff's decedent quit smoking in response to being diagnosed with lung cancer. *See* 666 A.2d at 247. Although there was ample evidence to support a diagnosis of asbestos related lung cancer at the time of his diagnosis, plaintiff, working under the mistaken belief that his cancer was brought on by his smoking, failed to "seek additional legal or medical help to ascertain the precise cause of his cancer" until four years later. *Id.* at 250. Our Supreme Court found that "[t]he decedent's failure to ascertain the cause of his injury was the result of 'somnolence,' rather than 'blameless ignorance'" and thus held that "decedent's mistaken belief cannot toll the statute of limitations." *Id.* (quoting *Ayers, supra*).

In *Love v. Raymark Indus., Inc.*, 430 Pa. Super.155, 633 A.2d 1185 (1993), the plaintiff was exposed to asbestos throughout his employment as a laborer, welder, sandblaster and shotblaster. *Id.* at 1186. In 1982, plaintiff was told by the plant physician that he had a "dirty lung" and should surrender his position as a shotblaster. *Id.* Although plaintiff failed to inquire with the physician regarding the cause of his condition, he later conceded that he thought it to have been work related. *Id.* Later that year, plaintiff was diagnosed with lung cancer, which he suspected was work related, and

subsequently underwent surgery. *Id.* Following surgery, plaintiff consulted a lawyer who sent him to a specialist who concluded there was a causal connection between plaintiff's lung cancer and his asbestos exposure. *Id.* However, plaintiff failed to file suit until 1985. *Id.* The Superior Court affirmed the trial court's decision not to toll the statute. *Id.* at 1187. The court found that because plaintiff "suspected that it was related to his occupational exposure to asbestos" that [u]nder these circumstances, even if the physicians did not inform [plaintiff] of the <u>cause</u> of his lung condition, it was unreasonable as a matter of law for [plaintiff] not to make inquiry." *Id.* The court held that the causal connection between asbestos and cancer was known and failure to inquire with his physicians about the cause of his cancer "was unreasonable as a matter of law". *Id.* at 1187. Further the court opined:

> "If, as appellants allege, Love did not have actual knowledge of the causal connection between his lung cancer and his exposure to asbestos, it is clear that, as a matter of law, he failed 'to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery [was] based and to institute suit within the prescribed statutory period'."

*Id.* (quoting *Pocono* 468 A.2d at 471).

In the instant case, Plaintiff was informed by her surgeon, Dr. Smith, and her gynecologist, Dr. Greathouse, that she had cancer and was to cease taking HRT. Similar to the Plaintiff in *Love* who was instructed to stop shotblasting, Plaintiff herein was instructed to cease taking HRT. The information regarding the causal link between HRT and breast cancer, similar to the link between asbestos and lung cancer, was available if a diligent investigation had been undertaken by the Plaintiff. This Court holds that the rationale in *Love* applies here, and the fact that Plaintiff failed to use reasonable diligence to inform herself

23

of available information important to a possible cause of action cannot toll the statute in her favor.

In order to toll the two year statute of limitations, Plaintiff must show that she made a reasonably diligent effort to obtain information regarding her injury and why it was unobtainable at that time. This Court finds that not only did Plaintiff not undertake a diligent investigation of the causes of her injury, but that she undertook no investigation whatsoever.

Between 1991 and 2000, Coleman was alerted both by her doctors and monthly through prescription package inserts (provided by Wyeth and approved by the FDA) that HRT possibly increased the risk of breast cancer. On October 20, 2000, Coleman was instructed to cease taking HRT due to her diagnosis of breast cancer. Yet despite these warnings, Coleman failed to ask her treating doctors about the possible causes of her diagnosis. This Court concludes that an objectively reasonable person, informed by her doctors, prescription fact sheet inserts, and national and local media that the HRT medicine she was taking for nine years could cause breast cancer who is later diagnosed with breast cancer, is under a duty to investigate the correlation between HRT and breast cancer at the time she is told she has breast cancer.

The Plaintiff misinterprets *Burnside v. Abbott Laboratories*, 251 Pa. Super. 264, 505 A.2d 973 (Pa. Super. Ct. 1986). Plaintiff argues that *Burnside* supports her contention that the statute of limitations should be tolled in this case. However, *Burnside* addresses a different prong of the discovery rule than the case *sub judice*. The issue in the present case is whether Plaintiff had a duty to diligently investigate possible causes of her disease at the date of her diagnosis. In contrast, the plaintiff in *Burnside* immediately

24

began to ask questions upon being diagnosed with cervical stenosis. *Id.* at 988. Her questions persisted upon learning of a possible causal link between DES and her cervical stenosis which continued even after she was rebuffed. *Id.* at 989. The rebuffing by the doctors is relevant to the second prong of the discovery rule, which the plaintiff in *Burnside* reaches because she followed her duty to diligently investigate her injury. *Id.* at 989-90. This Court finds that the Plaintiff herein failed to diligently investigate any correlation between the HRT and breast cancer, and therefore the second prong as to her claim why discovery was impossible by her, is misplaced and dehors the factual record here.

The Plaintiff fails to present any viable support for her contention that knowledge of the possible correlation between HRT and breast cancer was not available before the WHI. Accordingly, Plaintiff fails to prove that through reasonable diligence beginning at the date of diagnosis, she would not have been able to find the information necessary to sustain her case and toll the statute of limitations. This court holds that as of October 20, 2000, a diligent investigation would have revealed ample evidence to support Plaintiff's claim and the discovery rule is not available to her.

Numerous studies conducted before WHI have been documented regarding the link between HRT and breast cancer. The FDA relied on studies conducted as early as 1990 to approve the warnings that accompanied HRT prescriptions. Plaintiff's own doctors relied on these same studies to inform patients who were considering HRT medications for menopausal symptoms.

Further, Plaintiff was provided with the information that a possible causal link existed between HRT and breast cancer upon being prescribed HRT. This Court finds

25

that Plaintiff was put on notice of the connection between HRT and breast cancer before the Women's Health Initiative was published, yet independently chose not to investigate its association to her cancer.

The law is clear: Plaintiff was responsible for investigating the correlation between HRT and breast cancer, especially after she was told that her breast cancer was estrogen receptor positive and warned it could possibly have been caused by HRT. As such, Plaintiff has failed to provide sufficient evidence that she did not know nor reasonably could have known that HRT could cause breast cancer. Therefore, the statute of limitations cannot be tolled in this case.

## ORDER

AND NOW, to wit, this 24ᵗ day of September 2007, it is hereby Ordered and Decreed that this Court finds that Plaintiff's statute of limitations began to run on October 20, 2000, when she was diagnosed with breast cancer and that the discovery rule does not apply. Therefore, the Plaintiff's claim is dismissed as untimely and thus Wyeth's Motion for Summary Judgment is GRANTED.

**BY THE COURT:**

-------------------------------------
**Date**

-------------------------------------------
**ALLAN L. TERESHKO, J.**

that Plaintiff was put on notice of the connection between HRT and breast cancer before the Women's Health Initiative was published, yet independently chose not to investigate its association to her cancer.

The law is clear: Plaintiff was responsible for investigating the correlation between HRT and breast cancer, especially after she was told that her breast cancer was estrogen receptor positive and warned it could possibly have been caused by HRT. As such, Plaintiff has failed to provide sufficient evidence that she did not know nor reasonably could have known that HRT could cause breast cancer. Therefore, the statute of limitations cannot be tolled in this case.

## ORDER

AND NOW, to wit, this **24**ᵗ day of September 2007, it is hereby Ordered and Decreed that this Court finds that Plaintiff's statute of limitations began to run on October 20, 2000, when she was diagnosed with breast cancer and that the discovery rule does not apply. Therefore, the Plaintiff's claim is dismissed as untimely and thus Wyeth's Motion for Summary Judgment is GRANTED.

**BY THE COURT:**

COPIES SENT
PURSUANT TO Pa. R.C.P 236(b)

SEP 2 4 2007

FIRST JUDICIAL DISTRICT OF PA
USER I.D.:

_____
**ALLAN L. TERESHKO, J.**

26

GRACIANA MANALO AND
FELIPE MANALO,

    PLAINTIFFS,

    V.

WYETH PHARMACEUTICALS, INC., ET AL.,

    DEFENDANTS.

COURT OF COMMON PLEAS
OF PHILADELPHIA COUNTY

JUNE TERM, 2004

NO. 004503

## AFFIDAVIT OF ANDREW J. TREVELISE, ESQUIRE

Andrew J. Trevelise, Esquire, being duly sworn, hereby deposes and says as follows:

1.　　　　I am an attorney representing Defendant Wyeth (Wyeth) in numerous lawsuits in which plaintiffs allege injury from ingestion of hormone replacement therapy ("HRT") medications. Those cases have been coordinated in the Philadelphia Court of Common Pleas Mass Tort Program.

2.　　　　I submit this Affidavit in support of Wyeth's Petition to Strike Off Plaintiffs' Discontinuance Pursuant to Pa. R Civ. P. 229(c).

3.　　　　On or about November 7, 2007, pursuant to the Revised Mass Tort Procedures and in compliance with my obligation of good faith, I conferred with Plaintiffs' counsel, Tobias Millrood, regarding Wyeth's Motion for Summary Judgment Based on the Expiration of the Statute of Limitations to determine if Plaintiffs would oppose the Motion.

4.　　　　On or about November 7, 2007, Mr. Millrood said that he would refer the issue to Kenneth Fromson, co-counsel for Plaintiffs in the above-captioned matter.

**EXHIBIT E**

5.        On November 8 and 9, 2007, I received two emails from Mr. Fromson.  First, Mr. Fromson advised that Plaintiffs had already filed a *praecipe* for discontinuance on November 8, 2007.  Second, he advised that the discontinuance was without prejudice.  A copy of the emails are attached as Exhibit E to Wyeth's Petition.

Andrew J. Trevelise, Esquire

Sworn to and subscribed before me
this 14th day of November, 2007.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
RUTH REBER, Notary Public
City of Philadelphia, Phila. County
My Commission Expires April 21, 2011

```
----- Original Message -----
From: KennethFromson@lawampm.com <KennethFromson@lawampm.com>
To: Trevelise, Andrew J.
Cc: tmillrood@sbtklaw.com <tmillrood@sbtklaw.com>
Sent: Fri Nov 09 09:04:12 2007
Subject: RE: HRT Litigation: Manalo v. Wyeth
```

Andy,

My understanding is that it was filed without prejudice. I will follow up and get you a copy. If same is already imaged in our system, then I will email to you.

Ken


"Trevelise, Andrew J." <ATrevelise@ReedSmith.com>

11/08/2007 05:22 PM
To
      <KennethFromson@lawampm.com>
cc
      <tmillrood@sbtklaw.com>
Subject
      RE: HRT Litigation: Manalo v. Wyeth


Ken
 Can you provide me with a copy of the praecipe for discontinuance? Was it with or without prejudice? Thanks


Andrew J. Trevelise Esq
215-851-8250
atrevelise@reedsmith.com

Reed Smith LLP
2500 One Liberty Place
1650 Market St
Philadelphia, PA 19103
215-275-1377 cell
Fax 215-851-1420

EXHIBIT G

From: KennethFromson@lawampm.com [mailto:KennethFromson@lawampm.com]
Sent: Thursday, November 08, 2007 11:43 AM
To: Trevelise, Andrew J.
Cc: tmillrood@sbtklaw.com
Subject: HRT Litigation: Manalo v. Wyeth

Andy,

I am informed our local counsel, Tobi Millrood, that you conferred with him
and requested Plaintiff Manalo discontinue her action or face a summary
judgment motion. We filed a praecipe for discontinuance this morning, so
there is no need for the motion.  As a courtesy, would you simply confirm
receipt of this email so I know you received it.  Call me with any questions
you may have.

Ken Fromson
Finkelstein & Partners
845-562-0203 x2755


* * *


This E-mail, along with any attachments, is considered confidential and may
well be legally privileged. If you have received it in error, you are on
notice of its status. Please notify us immediately by reply e-mail and then
delete this message from your system. Please do not copy it or use it for any
purposes, or disclose its contents to any other person. Thank you for your
cooperation.

* * *

To ensure compliance with Treasury Department regulations, we inform you
that, unless otherwise indicated in writing, any U.S. Federal tax advice
contained in this communication  (including any attachments) is not intended
or written to be used, and cannot be used, for the purpose of (1) avoiding
penalties under the Internal Revenue Code or applicable state and local
provisions or (2) promoting, marketing or recommending to another party any
tax-related matters addressed herein.

Disclaimer Version RS.US.1.01.03
pdc1


This Email has been scanned for all viruses by PAETEC Email Scanning
Services, utilizing MessageLabs proprietary SkyScan infrastructure. For more
information on a proactive anti-virus service working around the clock,
around the globe, visit http://www.paetec.com.

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**    Attorneys for Plaintiffs
By:   Tobias L. Millrood, Esquire
      Steven D. Resnick, Esquire
      Bharati O. Sharma, Esquire
      Attorney I.D. No.: 77764/86927/88440
280 King of Prussia Road
Radnor, PA  19087
(610) 667-7706

| | |
|---|---|
| GRACIANA MANALO and<br>FELIPE MANALO, | **COURT OF COMMON PLEAS OF**<br>**PHILADELPHIA COUNTY** |
| Plaintiffs, | **JUNE, 2004** |
| v. | **NO. 004503** |
| WYETH PHARMACEUTICALS, INC.,<br>et al. | |
| Defendants. | |

## PRAECIPE FOR VOLUNTARY DISCONTINUANCE
## WITHOUT PREJUDICE PURSUANT TO PA.R.C.P. 229

**TO THE PROTHONOTARY:**

Pursuant to Pa.R.Civ.P. 229, Plaintiffs seek to voluntarily terminate this action as to all Defendants. Kindly discontinue all claims against all Defendants WITHOUT PREJUDICE.

Dated: November 8, 2007

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

By: _____
Tobias L. Millrood, Esquire
Steven D. Resnick, Esquire
Bharati O. Sharma, Esquire

*Attorneys for Plaintiffs*

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that a true and correct copy of Plaintiffs' Praecipe for

Voluntary Discontinuance Without Prejudice was served by First Class Mail on the 8th[th] day of

November, 2007 on the following:

Andrew Trevelise, Esq.
Reed Smith
2500 Liberty Place
1650 Market St.
Philadelphia, PA  19103-7301

Dated:  November 8, 2007

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

By: _____
Tobias L. Millrood, Esq.
Steven Resnick, Esq.
Bharati O. Sharma, Esq.c

*Attorneys for Plaintiff*

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**   **Attorneys for Plaintiffs**
By:   Tobias L. Millrood, Esquire
      Steven D. Resnick, Esquire
      Bharati O. Sharma, Esquire
      Attorney I.D. No.: 77764/86927/88440
**280 King of Prussia Road**
**Radnor, PA 19087**
**(610) 667-7706**

| | |
|---|---|
| GRACIANA MANALO and<br>FELIPE MANALO,<br><br>Plaintiffs,<br><br>v.<br><br>WYETH PHARMACEUTICALS, INC.,<br>et al.<br><br>Defendants. | COURT OF COMMON PLEAS OF<br>PHILADELPHIA COUNTY<br><br>JUNE, 2004<br><br>NO. 004503 |

## PRAECIPE FOR VOLUNTARY DISCONTINUANCE
## WITHOUT PREJUDICE PURSUANT TO PA.R.C.P. 229

**TO THE PROTHONOTARY:**

Pursuant to Pa.R.Civ.P. 229, Plaintiffs seek to voluntarily terminate this action as to all Defendants. Kindly discontinue all claims against all Defendants WITHOUT PREJUDICE.

Dated: November 8, 2007

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

By: _____
      Tobias L. Millrood, Esquire
      Steven D. Resnick, Esquire
      Bharati O. Sharma, Esquire

*Attorneys for Plaintiffs*

**EXHIBIT F**

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that a true and correct copy of Plaintiffs' Praecipe for

Voluntary Discontinuance Without Prejudice was served by First Class Mail on the 8th[th] day of

November, 2007 on the following:

Andrew Trevelise, Esq.
Reed Smith
2500 Liberty Place
1650 Market St.
Philadelphia, PA  19103-7301

Dated:  November 8, 2007

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

By: _____
Tobias L. Millrood, Esq.
Steven Resnick, Esq.
Bharati O. Sharma, Esq.c

*Attorneys for Plaintiff*

114037

COURT OF COMMON PLEAS
OF PHILADELPHIA COUNTY

GRACIANA MANALO AND
FELIPE MANALO,

    PLAINTIFFS,

    V.                                               JUNE TERM, 2004

WYETH PHARMACEUTICALS, INC., ET AL.,                 NO. 004503

    DEFENDANTS.

## ORDER

AND NOW, this 7th day of December, 2007, upon consideration of Wyeth's Petition to Strike Off Plaintiffs' Discontinuance Pursuant to Pa. R. Civ. P. 229(c), and any response thereto, it is hereby **ORDERED** that Wyeth's Petition is **GRANTED** and that Plaintiffs' Praecipe to Discontinue Without Prejudice is hereby **STRICKEN**.

BY THE COURT:

_____
TERESHKO, J.

NOTICES SENT
PURSUANT TO Pa.R.C.P.236(b)
DEC 10 2007
FIRST JUDICIAL DISTRICT OF PA
N. SWEENEY

COMPLEX LIT CENTER
DEC 10 2007
N. SWEENEY

**EXHIBIT G**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

GRANCIANA MANALO and FELIPE
MANALO;                                                     Court File No. 07-cv-4557 (JMR/SRN)

              Plaintiffs,

    v.

WYETH, WYETH PHARMACEUTICALS
INC., WYETH-AYERST                                  **WYETH DEFENDANTS' MOTION TO**
PHARMACEUTICALS INC., WYETH-                    **DISMISS OR STAY**
AYERST INTERNATIONAL INC., WYETH
LABORATORIES INC. and WYETH
PHARMACEUTICALS, PHARMACIA &
UPJOHN, INC., PHARMACIA & UPJOHN
COMPANY, PHARMACIA & UPJOHN
LLC., PHARMACIA & UPJOHN COMPANY
LLC., PHARMACIA CORPORATION,
PFIZER INC., BARR LABORATORIES,
INC., BARR PHARMACEUTICALS, INC.
AND WATSON PHARMACEUTICALS,
INC.,

              Defendants.

---

Pursuant to Rule 12, Federal Rules of Civil Procedure, Defendants Wyeth, Wyeth

Pharmaceuticals Inc., Wyeth Pharmaceuticals, and Wyeth-Ayerst International Inc. (collectively

referred to as "Wyeth" and/or "Wyeth Defendants")[1] respectfully move for this Court's Order

dismissing or, in the alternative, staying this case pending resolution of Plaintiffs' first-filed case,

which was commenced in the Pennsylvania Court of Common Pleas ("P.C.C.P.") in 2004 and is

---

[1] Plaintiffs also name Wyeth Laboratories Inc. and Wyeth-Ayerst Pharmaceuticals Inc. as defendants. *See* Complaint, ¶¶ 4 and 6. On January 1, 1999, Wyeth Laboratories Inc. was merged into Ayerst Laboratories Inc. The surviving company was Ayerst Laboratories Inc., the name of which was later changed to Wyeth-Ayerst Pharmaceuticals Inc. On March 22, 2002, Wyeth-Ayerst Pharmaceuticals Inc. changed its name to Wyeth Pharmaceuticals Inc. As a result, Wyeth Pharmaceuticals Inc. will respond to allegations directed at Wyeth Laboratories Inc. and/or Wyeth-Ayerst Pharmaceuticals Inc.

**EXHIBIT H**

styled *Graciana Manalo, et al. v. Wyeth Pharmaceuticals, Inc., et al.*, P.C.C.P., June Term 2004, No. 004503.

Wyeth brings this Motion on the grounds that Plaintiffs improperly discontinued the Pennsylvania State Court Action in the face of the Wyeth Defendants' Summary Judgment Motion to dismiss that case based on the expiration of the applicable statute of limitations. The Wyeth Defendants promptly filed their Petition to Strike Off Plaintiffs' Discontinuance along with their Summary Judgment Motion, both of which are currently pending before the Pennsylvania State Court.

Accordingly, the Wyeth Defendants respectfully move for this Court's Order dismissing or staying this action pending final disposition of the first-filed 2004 Pennsylvania State Court Action. This Motion will be supported by the Wyeth Defendants' Memorandum of Law and any related Affidavits and file materials, which will be timely served and filed in accordance with the provisions of this Court's local Rule 7.1(b)(1). A Notice of Hearing will also be timely served and filed once a hearing date is obtained.

Respectfully submitted,

Dated: November 28, 2007

BASSFORD REMELE
*A Professional Association*

By:___s/ Carrie L. Hund_____
         Edward F. Fox (License #003132X)
         Carrie L. Hund (License #277149)
         33 South Sixth Street, Suite 3800
         Minneapolis, Minnesota 55402-3707
         Telephone: (612) 333-3000
         Facsimile: (612) 333-8829

         *ATTORNEYS FOR WYETH, WYETH
         PHARMACEUTICALS INC., WYETH-AYERST
         INTERNATIONAL INC., and WYETH
         PHARMACEUTICALS*

2